**WESTFED HOLDINGS, INC. Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

No. 92–820C.

United States Court of Federal Claims.

March 17, 2003.

Thomas G. Rafferty, with whom were Gerald A. Ford, Dan Rottenstreich, Alexandra D. Wald, and Rowan D. Wilson, New York City, for plaintiff.

Jane M.E. Peterson, with whom were Stuart E. Schiffer, Deputy Assistant Attorney General, David M. Cohen, Director, and Jeanne E. Davidson, Deputy Director, Civil Division, U.S. Department of Justice, Washington, DC for defendant. Ashley N. Bailey, William C. Buckhold, Maureen A. Delaney, Delisa M. Sanchez, Edward P. Sullivan, Tonia J. Tornatore, and David D. Zimmerman, Washington, DC, of counsel.

*OPINION*

HEWITT, Judge.

This case is before the court following a trial on damages. In a previous opinion, this court held that the contract between plaintiff Westfed Holdings, Inc. (Westfed) and defendant, under which defendant agreed to forbear from imposing certain regulatory capital maintenance requirements on the merged entity Western Federal Savings and Loan Association, was breached by the passage of the Financial Institutions Reform, Recovery and Enforcement Act of 1989, Pub.L. No. 101–73, 103 Stat. 183 (FIRREA) and its implementing regulations. *Westfed Holdings, Inc. v. United States,* 52 Fed.Cl. 135, 149 (2002) (*Westfed Holdings*).

Plaintiff seeks reliance damages for the breach, or, in the alternative, restitutionary damages based on Westfed's cost-of-performance, as well as restitution based on the loss avoided by the government by entering into the contract. Corrected Post–Trial Brief of Plaintiff Westfed Holdings, Inc. (Pl.'s Br.) at 1.

I. Background

The court conducted fourteen days of trial and heard the testimony of nineteen witnesses in the fall of 2002. In addition to the trial record, the court had the opportunity to consider extensive post-trial briefing filed by the parties. The following facts are presented here to put the contract, breach, and resulting actions of the parties in context. Additional factual findings will be made as

necessary in the sections that follow.[1]

On September 23, 1988, Westfed[2] acquired Bell Savings and Loan Association (Bell) and merged it with Western Federal Savings and Loan Association (Old Western) to form a new thrift also named Western Federal Savings and Loan Association (New Western). *Westfed Holdings,* 52 Fed.Cl. at 139–140. As part of the transaction, the Federal Savings and Loan Insurance Corporation (FSLIC), Westfed and New Western executed a Regulatory Capital Maintenance Agreement (RCMA) pursuant to which New Western's net worth would be maintained at the greater of $110,000,000 or 2% of New Western's liabilities for five years (modified capital requirement). Plaintiff's Exhibit (PX) 72 at WOF009 0706. In addition, the Federal Home Loan Bank Board (FHLBB) informed Westfed in a letter (forbearance letter) that it would not enforce the regulatory capital requirements of 12 C.F.R. § 563.13 as long as New Western met the net worth requirement set out in the RCMA. PX 70. FSLIC, Westfed and New Western also executed an Assistance Agreement whereby FSLIC agreed to contribute to New Western an amount equal to the capital shortfall of Bell. *See* PX 71; *Westfed Holdings,* 52 Fed.Cl. at 139–40.

On August 9, 1989, FIRREA was enacted. FIRREA and its implementing regulations changed the capital requirements applicable to thrifts. *See Westfed Holdings,* 52 Fed.Cl. at 140. As a result, the Office of Thrift Supervision (OTS),[3] requested that New Western submit an updated business plan detailing "the measures taken or planned to (1) increase the association's capital to the level required by FIRREA." PX 98 at RWE020 1057. Westfed complied with OTS's request but protested the imposition of FIRREA on New Western and informed OTS that New Western was "in full compliance with the capital requirements applicable to it." Defendant's Exhibit (DX) 372 at WOQ 113 953–54; PX 111 at WOQ113 0871; Tr. at 199–200.

The imposition of FIRREA caused immediate non-compliance under all of FIRREA's three capital tests,[4] *see* PX 98; Tr. at 2771–72, and New Western was ultimately seized and placed in receivership by OTS on June 4, 1993. *See* DX 221. At the time it was seized, New Western remained in compliance with the capital requirements applicable to it under the RCMA and the forbearance letter. *See* PX 150 at WFH App. 145; PX 156 at Opp.App. 747; *see also* Tr. at 1317, 2288.

## II. Discussion

### A. Reliance Damages

"The purpose of reliance damages is to compensate the plaintiff 'for loss caused by reliance on the contract.'" *Castle v. United States,* 301 F.3d 1328, 1341 (Fed.Cir. 2002) (quoting *Landmark Land Co. v. Fed. Deposit Ins. Corp.,* 256 F.3d 1365, 1379 (Fed. Cir.2001) (quoting *Restatement (Second) of the Law of Contracts (Restatement (Second) of Contracts* ) § 344(b) (1981))). Reliance damages may be awarded for loss actually sustained as a result of the breach of a promise upon which the injured party relied and should place the injured party in "'as good a position as he would have been in had the contract not been made.'" *Glendale Fed. Bank v. United States,* 239 F.3d 1374, 1382–83 (Fed.Cir.2001) (quoting *Restatement*

---

1. A full recitation of the background facts of this case was published in this court's opinion on liability. *See Westfed Holdings,* 52 Fed.Cl. at 137–41.

2. At the time of the negotiations for the acquisition Westfed was known as D.P. Holdings, Inc. but for convenience we refer to both as Westfed. In addition, Bell Holdings, Inc. (Bell Holdings), an affiliate of Westfed, was involved in the process of acquiring Bell from the Federal Savings and Loan Insurance Corporation (FSLIC). *See Westfed Holdings,* 52 Fed.Cl. at 139.

3. OTS took over the regulatory functions of FHLBB and FSLIC when both were abolished by FIRREA. *Westfed Holdings,* 52 Fed.Cl. at 140.

4. The three new capital requirements imposed by FIRREA were: (1) tangible capital must constitute at least 1.5% of assets, 12 U.S.C. § 1464(t)(2)(B); (2) core capital must constitute at least 3% of its assets, 12 U.S.C. § 1464(t)(2)(A); and (3) risk-based capital requirements in which risk-based capital is measured against the risk-weighted balance of total assets, 12 U.S.C. § 1464(t)(2)(C); 12 C.F.R. § 567.

*(Second) of Contracts* § 344(b)). The critical event in fixing reliance damages is the breach itself, not the time of contracting, and hence damages may be awarded for injuries resulting from "activities that occurred either before or after the breach" from which ascertainable losses as a result of the breach can be shown. *Id.* at 1383; *see also Restatement (Second) of Contracts* § 349 ("expenditures made in preparation for performance or in performance" may be recovered as reliance damages).

■ Any benefit retained from the expenditures made in reliance of the contract must be offset against the injured party's damages. *See Westfed Holdings,* 52 Fed.Cl. at 161. In addition, the breaching party may further offset the damages awarded by proving any losses that the injured party would have incurred in the event of full performance of the contract. *See Restatement (Second) of Contracts* § 349; *see generally L. Albert & Son v. Armstrong Rubber Co.,* 178 F.2d 182, 189 (2d Cir.1949).

■ Because reliance damages (like lost profits) are contract damages, to recover a plaintiff must also show that: (1) its losses were reasonably foreseeable at the time of the contract; (2) the breach was a substantial factor in causing its losses; and (3) it has proven its losses with reasonable certainty. *See Hansen Bancorp, Inc. v. United States,* 53 Fed.Cl. 92, 99 (2002); *Bluebonnet Sav. Bank, FSB v. United States (Bluebonnet I),* 47 Fed.Cl. 156, 167 (2000), *rev on other grounds,* 266 F.3d 1348 (Fed.Cir.2001); *see also Restatement (Second) of Contracts* §§ 344(b), 349, 351–52.

### 1. Expenditures in Reliance on the Contract

Plaintiff contends that the financing for the acquisition and merger of Bell and Old Western was raised and expended in reliance on the contract. *See* Response of Plaintiff Westfed Holdings, Inc. to Defendant's Post–

Trial Proposed Conclusions of Law (Pl.'s Resp.) at 2; Pl.'s Br. at 2–5. In total, plaintiff claims that it expended $234.09 million in cash and $71.29 million of payments-in-kind (PIK), and that it incurred $851.89–887.71 million of "additional obligations" in reliance on the contract.[5] Plaintiff [Westfed's] Proposed Final Findings of Fact (Pl.'s PFFF) ¶ 70.

Defendant argues that plaintiff did not contribute Old Western in reliance on the acquisition agreement for Bell, *see* Defendant's Post–Trial Proposed Conclusions of Law (Def.'s Br.) at 6; the purchase price of Bell was zero dollars, *see* Defendant's Response to the Post–Trial Proposed Findings of Fact of Plaintiff Westfed Holdings, Inc. (Def.'s Resp.) ¶ 70.1.2; and the PIK expenditures and other "additional obligations" were either not incurred under the contract or not "actually expended." Def.'s Resp. ¶ 70.3; Defendant's Response to the Post–Trial Brief of Plaintiff Westfed Holdings, Inc. (Def.'s Reply) at 3–5.

#### a. Acquisition of Old Western and Bell

Plaintiff claims that it spent $190.4 million to purchase Old Western and Bell in reliance on the contract with defendant.[6] *See* Pl.'s PFFF ¶¶ 70.1.1–70.1.3. Plaintiff argues that it unequivocally established at trial that the acquisition of Old Western was part of a single transaction that was the subject of the contract. Pl.'s Br. at 3–4; Pl.'s PFFF ¶ 30. Plaintiff contends that the evidence proves that Westfed purchased and then contributed all of the stock of Old Western to the merged entity as required by the various agreements. Pl.'s Br. at 4.

■ Defendant argues that plaintiff had a pre-existing legal obligation to acquire Old Western and therefore plaintiff did not acquire Old Western in reliance on the contract. Def.'s Br. at 7. In addition, defendant argues that because plaintiff combined Old Western and Bell "to further its own busi-

---

5. Alternatively, plaintiff claims the same amount as restitutionary damages measured by the non-breaching party's cost-of-performance of the contract. Pl.'s Br. at 22.

6. The amount consists of (1) $148.34 million to acquire Old Western common stock; (2) $22.06 million for acquisition and financing costs; and (3) a $20 million capital contribution to Bell. *See* Pl.'s Br. at 20; DX 380 at FWE036 1347; PX 97 at PWE020 0335.

ness strategy," *id.* at 9, plaintiff can not recover reliance damages for the related expenditures. *Id.* The court disagrees. The standard for reliance damages is not, as defendant incorrectly argues, *see* Def.'s Reply at 2–3, whether the expenditures were required under the contract, but instead whether the expenditures were made in reliance upon the contract.[7] *See Landmark*, 256 F.3d at 1379 ("The purpose of reliance damages is to compensate the plaintiff 'for loss caused by reliance on the contract.'"); *Restatement (Second) of Contracts* § 344(b) ("Reliance interest" is the "interest in being reimbursed for loss caused by reliance on the contract . . . .").

■ The evidence presented at trial clearly establishes that Westfed acquired Old Western in reliance on the contract between the parties. The FHLBB approved plaintiff's acquisition of Bell as a multi-step transaction that consisted of (1) Bell's conversion from mutual to stock form; (2) Westfed's purchase of Bell; (3) the creation of a wholly-owned subsidiary of Bell; (4) the merger of that subsidiary with Old Western; (5) the subsequent merger of that new corporation with the converted Bell; and (6) the renaming of the resulting corporation as New Western. *See* PX 59 at SJA 817; PX 71 at WOF009 2014–15. *See also* PX 72 at WOF009 0701. The testimony of principals and executives of plaintiff[8] is consistent on this point and is supported by the documentary evidence. Mr. John Harding, a negotiator for Westfed in preparation for the merger and later a director of New Western, *see* Tr. at 67, 78–79, testified that Westfed viewed the acquisition and merger of Bell and Old Western as "a single transaction." Tr. at 182. Ms. Joan Manning, the chief financial officer of Westfed who participated in drafting sections of the H-(e)3 Application and was responsible

for tracking the incoming funds during the closing of the transaction, *see* Tr. at 616, 624, 626, confirmed that all of the documents involved in the merger and acquisition were considered part of a single transaction. *See* Tr. at 623–24. As a result, the acquisition of Bell could not have been completed without the additional acquisition of Old Western by Westfed and, therefore, the purchase of Old Western was in reliance on the contract between the parties.

Westfed did, as defendant points out, enter into an Acquisition Agreement with Old Western in 1987 pursuant to which Westfed agreed to purchase Old Western. *See* PX 21. But, as defendant concedes, the Acquisition Agreement conditioned the purchase of Old Western on regulatory approval for the transaction. Defendant's Post–Trial Proposed Findings of Fact (Def.'s PPFF) ¶ 8.1.2; PX 21 at WFH065029–30. Western filed a H-(e)1 application with FSLIC seeking approval for the stand-alone acquisition of Old Western in September, 1987. DX 310. But this approval was never given and the H-(e)1 application was withdrawn.[9] PX 60 at WOP201 0121; Tr. at 157 (Testimony of Mr. Harding).

Defendant argues that the Federal Home Loan Bank of San Francisco (FHLB–SF) was preparing a recommendation of approval of the H-(e)1 application for the FHLBB but that it was never completed because Westfed pushed the merger transaction instead. Def.'s Resp. at ¶ 24.3. Defendant's reliance on an unapproved transaction that did not go forward is misplaced. The existence of a proposed transaction that was not consummated is not a defense to a claim of a breach of a contract that was in fact made. The FHLBB approved the merger of Bell and Old Western and that was the contract that was entered into by the parties. Westfed

---

7. Defendant appears to confuse the standard for reliance damages with the standard for restitutionary damages. *See* Def.'s Reply at 3. Parties who seek cost-of-performance restitutionary damages must prove that the costs sought were expended as required under the contract. *See Landmark*, 256 F.3d at 1375 ("[I]n order to be compensable as restitution, the plaintiff's contribution must have been made in performance of its contractual obligations.").

8. The court found the testimony of the witnesses in this case uniformly straightforward. Testifying many years after the events, some witnesses had lapses in memory, but the court discerned no lack of candor about the events recounted.

9. In contrast, Westfed's H-(e)3 application for the merger of Old Western and Bell was approved by the FHLBB on August 22, 1988. *See* PX 58.

relied upon the same contract for the merger of Bell and Old Western when purchasing Old Western. The acquisition of Old Western on a stand-alone basis did not take place nor was there any guarantee that it would have had the Bell–Old Western merger not occurred.

Defendant points to Westfed's audited financial statements to support its argument that plaintiff should not recover any damages for the acquisition of Bell because there was "no cost of acquiring Bell." Def.'s Resp. ¶ 70.1.2; DX 390 at PWE026 0997. Plaintiff claims that the evidence shows that Westfed purchased and contributed $20 million of Bell stock to the transaction. Pl.'s PFFF ¶ 70.1.2. The court finds that both the credible testimony of three witnesses, who were Westfed employees at the time of the transaction, and the documentary evidence, support plaintiff's contention that Westfed contributed $20 million to Bell in reliance on the contract.[10] See Tr. at 162–64, 630, 674, 782; PX 74 at WOF009 0645.

### b. Interest

■ Plaintiff seeks $30.257 million in reliance damages for cash interest payments made in reliance on the contract. See Pl.'s PFFF ¶ 70.1.4–70.1.4.3. Plaintiff also seeks $13.439 million in reliance damages for cash dividend payments made in reliance on the contract.[11] See Pl.'s PFFF ¶ 70.1.5. Defendant concedes that the interest and dividend payments were made by plaintiff but argues that they do not constitute damages under the contract. See Def.'s Resp. ¶¶ 70.1.4–70.1.4.3.

This court has previously held that actual expenditures in the form of interest made in reliance on the contract are recoverable as reliance damages. See Westfed Holdings, 52 Fed.Cl. at 163–64.

■ According to the Assistance Agreement, Westfed's obligations under the Agreement were conditioned upon:

"[Westfed's] financing its acquisition of [Bell] and [Old] Western through the public and/or private sales of debentures and preferred stock, and raising through such sales at least $190 million, net of estimated issuance costs, of which at least $120 million, net of estimated issuance costs, shall constitute capital as calculated in accordance with generally accepted accounting principles."

PX 71 at WOF009 2033. By entering into the Assistance Agreement, defendant clearly contemplated and agreed to the terms it contained. See generally United States v. Winstar, 518 U.S. 839, 861–69, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996). Those approved terms included plaintiff's intention to finance the merger through the issuance of debt. According to the evidence presented, plaintiff would not have incurred the debt, or the obligation to pay interest on the debt, if the contract had not been finalized. Expenditures made "in preparation for performance" may be recovered as reliance damages. Restatement (Second) of Contracts § 349. The court finds that the interest and dividend payments, which plaintiff now claims as reliance damages, were payments made on debt that was incurred in reliance on the contract.

### c. Payments–In–Kind

Plaintiff seeks $71.286 million in reliance damages for PIK expenditures.[12] Pl.'s

---

**10.** Mr. Harding explained that the $20 million referenced in the stock purchase agreement, see PX 74, was the purchase price of Bell stock that was accounted for as a capital infusion. See Tr. at 163–64. Ms. Manning confirmed that the $20 million capital contribution made to New Western on the day of the closing was actually the purchase price for Bell. See Tr. at 630, 674. Finally, Mr. Arthur Bacci, an executive of Westfed responsible for preparing and testing New Western's 1988 Business Plan, see Tr. at 740, understood the $20 million capital contribution by Westfed to be "reflected as additional paid-in capital" and that "it became part of the capital base of [New] Western." Tr. at 782–83.

**11.** Plaintiff also seeks $851.89 to 887.71 million in "additional obligations." See Pl.'s PFFF ¶ 70.3. These costs consist of accumulated unpaid interest on plaintiff's debt obligations and therefore are not recoverable as reliance damages. See Westfed Holdings, 52 Fed.Cl. at 164 ("Westfed cannot recover its unpaid interest.").

**12.** It is not disputed that plaintiff paid $11.286 million in payments-in-kind on the restructured

PFFF ¶ 70.2–70.2.2. Defendant concedes that plaintiff spent $71.29 million in PIK expenditures, see Def.'s Resp. ¶¶ 70.2–70.2.2, but appears to argue that these payments do not constitute reliance damages because they were not "actually" paid.[13] Id.

When OTS made an objection to plaintiff's cash payments of dividends in August, 1989, see PX 98, plaintiff began instead to make payments-in-kind on the preferred shares. Tr. at 647–48. Similarly, in 1992 when cash payments would have caused plaintiff's liquidity reserve to fall below the amount required by OTS, see Tr. at 637–40, Westfed restructured its debentures to allow interest payments to be made in either cash or payments-in-kind and then proceeded to make payments-in-kind on the bonds.[14] Id.; PX 143 at FWE007 0970.

Like the cash interest and dividend payments, these payments-in-kind were payments made on the debts that were incurred as a result of the creation of New Western. The value of the payments-in-kind is not in dispute. Def.'s Resp. ¶¶ 70.2–70.2.2.2. The fact that the payments were not in cash does not appear to the court to be of legal significance and defendant has suggested no authority to that effect.

### 2. Foreseeability of Loss

■ Plaintiff must show that plaintiff's loss was foreseeable to the breaching party at the time of contract formation. *Landmark Land Co. v. United States*, 256 F.3d 1365, 1378 (Fed.Cir.2001); *Restatement (Second) of Contracts* § 351(1) ("Damages are not recoverable for loss that the party in

breach did not have reason to foresee as a probable result of the breach when the contract was made."). "Loss may be foreseeable as a probable result of a breach because it follows from the breach (a) in the ordinary course of events, or (b) as a result of special circumstances, beyond the ordinary course of events, that the party in breach had reason to know." *Landmark*, 256 F.3d at 1378 (quoting *Restatement (Second) of Contracts* § 351(2)). More specifically, plaintiff must prove the foreseeability of both the magnitude and type of damages, not just that loss was generally foreseeable. *Id.* (citing 5 Arthur Corbin, *Corbin on Contracts*, § 1012 at 88 (1964)).

Plaintiff contends that defendant evaluated and approved the expenditures now claimed as reliance damages and therefore these costs were entirely foreseeable to defendant. Pl.'s Br. at 2. Defendant responds that plaintiff does not meets its burden of showing both that it was foreseeable that the expenditures would be incurred under the contract, and that the expenditures would be rendered entirely worthless in the event of a breach. Def.'s Reply at 2.

The court finds that the evidence at trial proves that it was foreseeable at the time of contracting that the expenditures now claimed as reliance damages by plaintiff would be incurred under the contract. All of the money claimed in reliance damages was detailed in the transaction documents and actually approved by defendant. Defendant knew at the time of the contract that plaintiff was financing the acquisition of Old Western

---

bonds, Tr. at 640, and $60 million in payments-in-kind on the preferred shares. Tr. at 647–48.

13. Defendant represents that plaintiff's expert, Gary B. Gorton, withdrew the PIK payments from his calculations of plaintiff's reliance damages based on this court's liability opinion. *See* Def.'s Resp. ¶ 70.2 (quoting Tr. at 1352). The court notes that defendant's quotation of Professor Gorton's testimony is incomplete and, as a result of being incomplete, is misleading. *See generally Precision Specialty Metals, Inc. v. United States*, 315 F.3d 1346, 1357 (Fed.Cir.2003) (circumstances under which incomplete quotation can be misleading). Defendant claims that the PIK payments were "removed [from reliance damages calculations]," according to defendant's

recitation of Professor Gorton's testimony, "because of the ruling by the judge that we should not count compounded interest other than what had *actually been paid*, even if it had been paid in PIK form." Def.'s Resp. ¶ 70.2 (emphasis in original). Professor Gorton, however, had completed the quoted passage by explaining that he "removed the *compounding of* the interest on the senior bonds, which [he] had calculated." Tr. at 1352 (emphasis added). "Compounded interest" and "actually paid interest" are two distinct items, as explained in the court's previous opinion. *See Westfed Holdings*, 52 Fed.Cl. at 163–64.

14. These payments-in-kind consisted of issuing additional new debentures to the investors in place of the cash. *See* PX 143 at FWE007 0970.

and Bell by issuing senior debentures and common and preferred stock to generate $207.5 million in acquisition funds. DX 283 at WOQ132 1341–42; DX 319 at WOF009 1021; PX 40 at SJA–345; PX 58 at WOF009 1056. It was foreseeable to defendant that plaintiff would need to make interest and dividend payments on this debt. Defendant also approved the $20 million purchase of Bell stock, PX 58 at WOF009 1057, and the $22.06 million in acquisition and financing costs at the time of the contract. DX 380 at FWE036 1347.

Defendant knew at the time of contracting that plaintiff had negotiated for and obtained a modified capital requirement in order to give New Western the time and cushion to implement its five-year business plan. Tr. at 2754–55, 2763 (Testimony of Mr. Jupiter). Mr. John Harding and Mr. Jay Jupiter, who were involved in the negotiations of the contract on behalf of plaintiff and defendant respectively, both testified that the RCMA and the forbearance letter were a significant part of the transaction, details of which were continuously negotiated by both parties. *See* Tr. at 116, 179, 2454–55, 2762–63. In addition, defendant knew at the time of contracting that, without the RCMA and forbearances, New Western would violate regulatory capital requirements on its first day of existence. Tr. 2771–72. The government's witness, Mr. Jupiter, the deputy director for the Mergers and Acquisitions Department of FSLIC during the time of the acquisition negotiation, *see* Tr. at 2722, testified on cross-examination that the government would not have approved a merger which would result in an out-of-compliance association. Tr. at 2771–72. The court finds that it was foreseeable to both parties that a likely result of the removal of the RCMA and the forbearance letter would be New Western's failure to meet regulatory capital requirement which would, in turn, lead to the seizure of the thrift and render Westfed's investment worthless.

### 3. Causation of Loss

#### a. Standard of Causation

■ Plaintiff must also prove that its damages were lost as a result of the breach.

The parties disagree over which causation standard applies to reliance damages. Defendant argues that plaintiff must satisfy both the "but for" and the "substantial factor" tests of causation. Def.'s Br. at 13. Plaintiff maintains that it bears the burden to prove only that the breach was a substantial factor in causing the damages alleged. Pl.'s Br. at 5–6.

The "substantial factor" test has governed the recovery of lost profits damages in numerous *Winstar*-related cases in this court. *See Bluebonnet I,* 47 Fed.Cl. at 173 ("Plaintiffs must prove defendant's breach was a substantial factor in causing their damages") (internal citations omitted), *rev'd on other grounds, Bluebonnet Sav. Bank FSB v. United States (Bluebonnet II),* 266 F.3d 1348, 1356 (Fed.Cir.2001) ("The Court of Federal Claims properly determined that the breach of the forbearances was a substantial factor in Bluebonnet's increased financing costs …"); *Coast Fed. Bank v. United States,* 48 Fed.Cl. 402, 434–35 n. 29 (2000), *rev'd on other grounds, Coast Fed. Bank v. United States,* 309 F.3d 1353 (Fed.Cir.2002) (*reh'g granted* Feb. 14, 2003); *Energy Capital Corp. v. United States,* 47 Fed.Cl. 382, 395 (2000), *rev'd in part on other grounds, Energy Capital Corp. v. United States,* 302 F.3d 1314 (Fed.Cir.2002); *Cal. Fed. Bank v. United States,* 43 Fed.Cl. 445, 451 (1999), *vacated in part on other grounds, Cal. Fed. Bank v. United States,* 245 F.3d 1342 (Fed. Cir.2001). As explained previously, *see Westfed Holdings,* 52 Fed.Cl. at 159, the court discerns no rationale for applying a more stringent or different standard to the recovery of reliance damages and, in addition, because lost profits and reliance damages are both measures of contract damages, the court finds that the "substantial factor" test of causation governs the recovery of reliance damages in the context of *Winstar*-related cases. However, as discussed below, the court finds that credible evidence presented in this case also supports a finding of causation under the "but for" test urged by defendant.

#### b. Cause of Westfed's Failure

■ Defendant maintains that the withdrawal of the modified capital requirement

was neither a substantial factor in New Western's failure nor the "but for" reason that New Western eventually failed. *See* Def.'s Br. at 13–14. Defendant insists that several other factors led to New Western's downfall including poor underwriting, an economic recession, earthquake and civil unrest, risky loans sold with recourse, a disastrous guaranteed syndication, negative core earnings, deficient management and internal controls, and insurmountable asset quality problems. Def.'s Reply at 21. Defendant argues that New Western was seized, not because of insufficient capital, but instead because it was unsafe and unsound, and because it had lost its economic viability. Def.'s Br. at 20.

Plaintiff acknowledges that factors other than the breach, such as the California recession, impaired New Western's performance in the early 1990s, Pl.'s Br. at 6, but argues that New Western would have survived if it had had the "cushion" that the modified capital requirement was designed to provide. Response of Plaintiff Westfed Holdings, Inc. ("Westfed") to Defendant's Post–Trial Proposed Conclusions of Law (Pl.'s Reply) at 9–10.

### i. Effect of the Breach

Prior to the imposition of FIRREA, New Western was successfully implementing the 1988 Business Plan (the Plan). The Plan called for the aggressive growth of New Western over the first five years after the September 23, 1988 acquisition and merger transaction. PX 66 at SJA–828; Tr. at 130–31. By December 1989, New Western had grown by approximately $554 million to reach an asset size of $4,801,733 billion, just short of the $4.831 billion size projected by the Plan for the bank's first-year's growth. PX 115 at WFH050455; Tr. at 771–72 (Testimony of Ms. Manning); PX 66 at SJA–852. In addition, New Western produced earnings of $28.96 million in 1989, PX 111 at WOQ113 0872, and, with the approval of OTS, paid dividends of $5.552 million in the first half of 1989. *See* PX 93; PX 96.

On August 18, 1989, OTS denied New Western's third request for dividends "primarily based on our concerns with your association's ability to achieve compliance with the tangible capital requirement ... that will shortly become effective with the enactment of regulations implementing [FIRREA]." PX 98 at RWE020 1056. OTS noted its concerns with the "apparent accounting-driven nature of [New Western's] mortgage banking operation and the resulting detrimental effect on the market value of [New Western]." *Id.* As defendant acknowledges, New Western had capital in excess of its modified capital requirement on this date. Def.'s Resp. at ¶ 37.1.3. OTS also directed New Western to submit a new business plan to address how it planned to increase its capital to FIRREA levels and to maintain profitability in order to pay future dividends. *See* PX 98 at RWE020 1057.

In November, 1989, OTS required the filing of a capital restoration plan to "detail the actions that [New Western] will take to meet its capital requirements as quickly as possible." PX 104 at SJA–1013. OTS determined that, while the capital restoration plan was under consideration, New Western was not permitted to "grow beyond net interest credit," or "make any capital distributions," or "act inconsistently with any other limitations on activities ... for [thrifts] not meeting capital standards." *Id.* at SJA–1014. Mr. Harding testified that the limitation of growth to "net interest credit" meant that New Western could only grow "in an amount equal to interest credit on [its] deposits" in order to avoid having "to sell assets just because [New Western] had credit[ed] interest on [its] deposits." Tr. at 200. As Mr. Harding explained, growth limited to "net interest credit" was "essentially no growth." *Id.* By comparison, under the 1988 Business Plan plaintiff had negotiated for and gained approval to grow at a rate that would double the size of the institution in five years. *See* PX 66 at SJA–852.

New Western's first capital restoration plan (CRP), filed on December 11, 1989, focused on achieving FIRREA compliance. Tr. at 775–76, 2128–29 (Testimony of Mr. Bacci, Mr. Nussbaum, New Western's chief financial officer from 1991 to 1993); DX 372. The CRP limited asset growth to only $400 million over five years. In addition, OTS continued to restrict New Western's growth

to "an amount equal to net interest credited on deposit liabilities" after approving the CRP on March 7, 1990. DX 211 at VWE002 0736; DX 372 at WOQ113 1027; Tr. at 776–77, 2514 (Testimony of Mr. Bacci, Mr. Mar, assistant district director of OTS).

In addition to limiting growth, OTS placed several other operating restrictions on New Western because it was undercapitalized under FIRREA standards. An OTS examiner testified that undercapitalized institutions, including New Western, could not accept, renew or roll over broker deposits, nor could they make types of loans or investments that were not either specified in their capital plan or approved in writing by the OTS assistant district director. Tr. at 2511–12, 2516.

In December, 1992, OTS notified New Western that it considered New Western to be "undercapitalized" under the Prompt Corrective Action (PCA) provisions of FDICIA.[15] PX 148 at WOQ136 2233; Tr. at 2067–68. The PCA notice informed New Western of "mandatory restrictions," *see* PX 148 at WOQ136 2236, and advised that New Western was not permitted to make any capital distribution until it achieved FIRREA compliance, *see* DX 211 at VWE002 0748, and that it could only make those types of loans and investments approved by OTS. *See* Tr. at 2516; DX 211 at VWE002 0740. In addition, New Western was required to achieve compliance with even higher core and risk-based capital ratios (5 percent core and 9 percent risk-based) than required as minimums by FIRREA (4 percent core and 8 percent risk-based). Tr. at 1062–63, 1972–73.

On March 5, 1993, OTS notified New Western that its was "significantly undercapitalized" under FDICIA and that OTS intended to issue New Western a Prompt Corrective Action Directive (Directive). DX 214 at WOQ136 0221. The notice listed additional restrictions that would be imposed on New Western at the time of the Directive's issuance.[16] *See* DX 214.

On June 4, 1993, OTS seized New Western and placed it in receivership. DX 221. OTS stated that the "grounds" for the receivership were that New Western was "critically undercapitalized" and that there was "no reasonable prospect for [New Western] to become 'adequately capitalized' without Federal assistance." DX 221 at 1.

The testimony shows that the regulatory restrictions imposed with the purpose of bringing New Western into compliance with FIRREA capital standards limited New Western's ability to implement its business strategies. Mr. Harding explained that New Western's inability to pursue its growth strategy impacted numerous aspects of the strategies detailed in its 1988 Business Plan. *See* Tr. at 200–12. The inability of New Western to grow its assets "greatly tied [its] hands for exploring and expanding new products and services," Tr. at 209, and meant that in order to "make room for ... new experimental asset[s]," on its balance sheet, New Western would have to "sell something else off." Tr. at 204, 210.

Mr. Harding also testified that New Western was "stuck with" a limited mortgage banking strategy because New Western's asset portfolio could not be grown and diversified as Westfed had originally planned. Tr. 205–07. Instead of pursuing an aggressive growth policy as planned, New Western's growth was limited to "net interest credited" after the imposition of FIRREA. Mr. Bacci, a financial analyst for Westfed, explained that "the capital constraint that was imposed primarily because of the risk-based capital component [of FIRREA], [ ] when you are already $100 million below that target, any time you add any asset with any risk weighting, you are putting yourself further in the hole in terms of capital requirements." Tr. at 925–26.

Not only was New Western's growth limited by FIRREA, New Western was in fact forced to shrink in order to come into capital compliance as required by the regulators.

---

15. The Federal Deposit Insurance Corporation Improvement Act of 1991, Pub.L. No. 102–242, 105 Stat. 2236 (1991) (FDICIA), was enacted on December 19, 1991. FDICIA set forth new capital requirements for federally-insured banks.

16. The court notes that no evidence was presented at trial indicating that the Directive was ever actually issued by OTS.

Several New Western employees testified that Westfed "could only shrink" in order to come into compliance with FIRREA, Tr. at 1272, 2289–92 (Testimony of Mr. Clark, executive in charge of New Western's Loan Servicing Department from 1992–1993, Mr. Nussbaum), and that New Western could not grow because of the shortfall of risk-based capital under FIRREA standards. Tr. at 2290–91 (Testimony of Mr. Nussbaum). Defendant acknowledges that plaintiff had only two options to achieve capital compliance under FIRREA; "either raise capital or reduce assets." Def.'s Reply at 22. New Western chose to attempt to satisfy FIRREA by selling off its high risk-weighted assets in order to shrink. Tr. at 2292 (Testimony of Mr. Nussbaum). New Western sold the newly-acquired Bell branches in Northern California solely for the purpose of coming into compliance with FIRREA. Tr. at 791–93. New Western also cut costs by reducing staff, which in turn hurt its ability to maintain adequate internal controls. Tr. at 2570–72.

### ii. Defendant's Evidence: Factors Other than the Breach

Defendant attempted to focus its evidence at trial on factors other than the breach which negatively impacted New Western's health. While defendant's evidence indicated that factors other than the breach also affected New Western, defendant's evidence also supported plaintiff's position that defendant's implementation of FIRREA in breach of its agreement had a major negative impact on New Western.

Several regulators testified that the government had repeatedly criticized New Western for its poor loan underwriting and internal asset review practices. Tr. at 2583–84, 2654–55, 2816 (Testimony of Ms. Williams, 1992 OTS examiner-in-charge, Mr. Pon, 1989 FDIC examiner-in-charge, Mr. Dochow, 1993 OTS examiner-in-charge). According to the regulators and the records of their examinations of New Western, the thrift did not have sufficient procedures in place to ensure that its underwriting policies and procedures were being followed, rendering New Western

susceptible to fraud and procedural violations, Tr. at 2575–76 (Testimony of Ms. Williams), a point also made by Mr. Nussbaum. Tr. at 2183.

But the OTS examiner-in-charge of the 1992 examination of New Western, Ms. Regina Williams, see Tr. at 2566–67, also testified that "[New Western's] board had spent too much effort [and] concentration on trying to achieve capital compliance." Tr. at 2570. Ms. Williams explained that the 1992 OTS examination of New Western criticized the thrift for focusing too narrowly on capital compliance. Tr. at 2614. Ms. Williams determined that New Western suffered in other areas, like asset quality and internal controls, because of its focus on capital compliance. Tr. 2570. Ms. Williams' testimony is consistent with and supports the testimony of Mr. James Bethel, president and chief executive officer of New Western from August 1992 through its seizure, see Tr. at 1027–28, who explained that "the amount of time that was required to deal with the regulatory issues . . . made it very difficult to start getting into the operating aspects of the business." Tr. 1033. Mr. Bethel further testified that he "never really got a chance to deal with the retail [banking] side of the business." Id.

Regulators testified that New Western's management failed to address deficiencies identified in the regulators' examinations and that management's "oversight and performance was unsatisfactory." Tr. at 2416–17, 2570 (Testimony of Mr. Mar, Ms. Williams). Regulators viewed New Western's internal controls as ineffective and incomplete. Tr. 2397–2402, 2573–74, 2661–62 (Testimony of Mr. Mar, Ms. Williams, Mr. Pon).

But, by 1993, Marianne Wright, the assistant regional director of OTS, see Tr. at 2565, praised the "highly capable, efficient and committed senior management team that had already achieved remarkable progress," DX 699 at RWE021 2020, and Mr. Darrel Dochow, the examiner-in-charge for the 1993 OTS examination of New Western, see Tr. at 2800, testified that New Western's executives in 1993 were doing a "good job" and "had much improved."[17] See Tr. at 2836–37, 2854.

---

17. Mr. Dochow also recognized that New Western's "severe undercapitalization" made it diffi-

In addition, the 1993 exam reported that New Western's internal asset review had "improve[d]" and was "generally effective." DX 430 at WOQ180 0127; *see also* Tr. at 2879.

Regulators complained that New Western made risky investments in acquisition, development and construction (ADC) projects, *see* DX 415 at FWE038 0859, and were worried that New Western was relying too heavily on gains on the sale of loans and other non-operating income. Tr. 2616. Regulators were also concerned because New Western's loan and real estate losses from 1990–1992 far exceeded what the thrift had projected so that instead of earning approximately $105 million as estimated, New Western lost approximately $76.9 million. Tr. 890–91, 1310, 2594.

Defendant also contends that the downturn in the California economy, which began in 1989, had a "devastating impact" on New Western. Def.'s PPFF ¶ 84.1. The evidence at trial indicated that the number of foreclosure properties received by New Western increased from 20 properties a year to approximately 20 to 27 properties per month. Tr. at 2581. New Western absorbed many unexpected losses and originated fewer loans because of the recession. Tr. 588, 1231, 1315–16, 2169.

Regulators testified that the bank's practices resulted in poor asset quality, including a high level of non-performing loans and real estate investments, as well as a large amount of intangible assets. Tr. at 1976, 2590–92, 2657–59, 2820–23. The 1992 OTS exam indicated that the ratio of New Western's classified assets to tangible capital was 335%, *see* Tr. at 2578, and continued to increase after the exam to 426%.[18] DX 430 WOQ180 0118. Mr. Dochow, the 1993 OTS examiner, testi-

fied that when classified assets "reach[ ] 65[%] of capital you know you have a real problem." Tr. at 2814–15.

But Mr. Dochow also concluded in the 1993 exam that New Western had "effectively managed its asset/liability structure." DX 430 at WOQ180 0133; *see also* Tr. at 2879–80. In addition, the 1993 exam reported that, although New Western's asset quality was "extremely poor," New Western "demonstrate[d] an ability to appropriately recognize and classify problem assets." DX 430 at WOQ180 0124. The report also indicated that New Western's "policies and procedures were minimal, but adequate" with regard to its "secondary marketing and mortgage banking activities." *Id.* at WOQ180 0134.

In its 1992 exam report, had also OTS determined that "[d]uring calendar years 1990 and 1991," New Western's management "made some progress in addressing significant on and off balance sheet risks." DX 427 at RWE015 1976. In addition, despite the regulators' concerns with the amount of losses New Western had suffered, at the time of seizure there was uncontradicted evidence that, in addition to meeting its contractual capital requirements, New Western had sufficient liquidity and "could readily meet all the anticipated cash out-flow needs of the institution without any difficulty at all." Tr. at 1279–80 (Testimony of Mr. Clark). New Western had adequate loan loss reserves, *see* Tr. at 2277–78, 2869–70, and was fully operational at the time it was seized. *See* Tr. 1317.

Despite the regulators' concerns with non-breach factors, it was apparent from testimony of the various examiner-in-charge that capital inadequacy was the primary reason for the downgrading of New Western's composite ratings.[19] In 1986, New Western had

cult for the thrift to hire and retain staff, *see* Tr. at 2868, but reported in the 1993 exam that New Western has recently placed "talented individuals" in several key positions, including senior underwrite, controller and auditor. Tr. at 2866–67.

**18.** "Classified assets" are substandard and doubtful assets which the OTS identifies as problem assets. *See* Tr. at 2818.

**19.** Composite ratings refer to the uniform bank rating system which the OTS uses to evaluate thrifts. *See* Tr. at 2403, 2562, 2638 (Testimony of Mr. Mar, Ms. Williams, Mr. Pon). The OTS rates thrifts on a scale from "1" to "5" with "1" being the best or highest rating. *See id.* In this case the OTS analyzed New Western under one of two sets of factors, either "MACRO" or "CAMEL." Under the "MACRO" rating system, the OTS examined management, asset quality, capital adequacy, risk management, and operating

an overall composite rating of "1," the highest rating awarded by OTS. *See* Tr. at 2474. In 1990, New Western was downgraded to a "4" composite rating,[20] *see* Tr. at 2523, and in 1993 OTS gave New Western the lowest composite rating of "5." *See* Tr. at 2807–08.

Mr. Mar, the assistant district director of OTS who reviewed and forwarded the 1990 exam, explained in his cover letter to the Board of Directors of New Western that "[a]mong the most critical concerns causing us to downgrade [New Western's] rating is the association's capital adequacy. [New Western] has substantial tangible and risk-based capital deficiencies under [FIRREA]." DX 421 at FWE038 1075. In addition, Mr. Mar informed Mr. Kenneth Binning, the Assistant Vice President of the Federal Reserve Bank of San Francisco, that "[a]ll of [the Simon/Martin Group's thrifts' (including New Western)] composite ratings have been downgraded within the past six months primarily because of the substantial capital deficiencies created by the new capital regulations." PX 121 at WOQ144 2011.

Mr. Mar of OTS testified that his understanding at the time was that an institution that failed to meet FIRREA's capital requirements automatically received a 4 composite rating at best. Tr. at 2528. Mr. Pon, who completed a 1989 exam of New Western for FDIC, *see* Tr. at 2634–35, testified that CAMEL ratings were subjective and that he did not think that a thrift could receive a "5" rating for capital and receive either a "1" or "2" composite rating.[21] *See* Tr. at 2665–68.

results. *See* Tr. at 2403. Under the later "CAMEL" rating system, the OTS analyzed capital, asset quality, management, earnings and liquidity. *See* Tr. at 2562–63. Each category was rated on the uniform scale and the thrift was also given a overall composite rating which was the weighted average of the individual ratings. *See* Tr. at 2403–04, 2468–69.

**20.** The 1990 examination was completed in December 1989 but the report was completed and forwarded to New Western in February 1990. *See* DX 421 at FWE038 1074, 1077; Tr. at 2523.

**21.** The 1989 FDIC exam assigned New Western a composite rating of "4." *See* Tr. at 2640. In the subcategories, New Western received: "5" for capital adequacy; "4" for asset quality; "3" for management; "3" for earnings; and "2" for liquidity. Tr. at 2642.

Defendant also offered the testimony of Mr. Wallace B. Bankhead and Dr. William G. Hamm as expert witnesses, who stated that, in their opinions, New Western would have incurred millions in losses and failed even if defendant had not breached the contract.[22] *See* Tr. at 1679–80, 2993. Neither witness developed a model to support his views of what losses New Western would have incurred in the "but-for" world of no breach. *See* Tr. at 1774, 3339–40. Instead both Mr. Bankhead and Dr. Hamm based their opinions on an analyses of the documents and testimony presented to the court through fact witnesses and certain other documents "of a type reasonably relied on by experts." Fed.R.Evid. 703; *see* Tr. at 1522–23, 2976. As discussed in the Evidence Appendix,[23] the court found this testimony to be of limited usefulness in analyzing the evidence before the court. The court primarily relies on the credible testimony of the fact witnesses who participated in the events in question, both plaintiff's and New Western's principals and executives, and the government regulators who supervised and examined New Western and had many years of experience monitoring financial institutions. *See* Def.'s Reply at 16.

### iii. Conclusion

The court finds that defendant's breach was a substantial factor in causing plaintiff's damages. Although New Western admittedly had other troubles, including poor asset quality, uneven internal controls, and a weak

**22.** Mr. Bankhead was accepted by the court as an expert in accounting and management of depository financial institutions. *See* Tr. at 1521.

At trial, the court accepted Dr. Hamm's testimony on the subjects of economics, and on thrift industry, thrift operation, thrift management and thrift regulation (collectively, thrift issues), subject to a motion to strike. Plaintiff's motion to exclude certain testimony of Dr. Hamm is addressed in the Evidence Appendix attached to this Opinion.

**23.** The Evidence Appendix attached to this Opinion, including without limitation, the Orders contained therein, shall be deemed incorporated herein by reference.

economy, New Western remained in compliance with the capital requirements applicable to it under its contract with the government until the day it was seized by OTS. Despite the imposition of FIRREA's capital requirements, New Western continued to operate within the contractual standards negotiated and agreed to by both parties. The court also finds based on all the credible evidence presented at trial that but for defendant's breach, New Western would not have been seized and, therefore, even the standard of causation urged by defendant is met by the facts of this case.

### 4. Reasonable Certainty

 Finally, plaintiff must present evidence establishing the amount of loss "with reasonable certainty" in order to recover reliance damages for the breach of a contract. *Restatement (Second) of Contracts* § 352. The reasonable certainty test for lost profits in this circuit is that " '[i]f a reasonable probability of damage can be clearly established, uncertainty as to the amount will not preclude recovery,' and the court's duty is to 'make a fair and reasonable approximation of the damages.' " *Bluebonnet II*, 266 F.3d at 1356–57 (quoting *Ace–Fed. Reporters, Inc. v. Barram*, 226 F.3d 1329, 1333 (Fed.Cir.2000) (internal citations omitted)).

Defendant argues that plaintiff is not entitled to reliance damages because it has not established the amount of its damages with certainty. Def.'s Br. at 38–40. Defendant maintains that $30 million of the funds claimed by plaintiff as reliance damages was used by plaintiff "for its own general corporate purposes," Def.'s Br. at 38, and that it was not lost by New Western's failure.[24] *Id.* The court finds defendant's motion to offset plaintiff's reliance damages in the amount of $30 million to be MOOT because plaintiff did not claim these monies as reliance damages. *See* Part II.A.1.a.

Defendant also contends that plaintiff has already been made whole for $17.5 million when Ariadne[25] released plaintiff from any obligation to return monies advanced for acquisition fees. Def.'s Br. at 38. Plaintiff points out that the $17.5 million received from Ariadne was unrelated to the contract. Pl.'s Reply at 7. The evidence presented at trial supports plaintiff's contention that the $17.5 million from Ariadne is not appropriate as an offset against plaintiff's reliance damages. The $17.5 million from Ariadne clearly was given to Westfed in exchange for the settlement and release of Westfed's breach of contract claim against Ariadne in a separate transaction. Tr. 677–78 (Testimony of Ms. Manning). Furthermore, plaintiff has not made a claim for the $30 million against which the government says the $17.5 million should be offset. *See* Def.'s Br. at 38; *see also* Part II.A.1.a.

Defendant argues that the interest and dividend payments made by plaintiff are not recoverable as reliance damages because they were not paid under the contract and were made at plaintiff's discretion. Def.'s Br. at 39. But, as explained in Parts II.A.1.b and c, this court finds that interest and dividend payments, whether made in cash or in payments-in-kind, are recoverable as reliance damages if the payments were, as here, actually made in reliance on the contract.

Finally, defendant maintains that the amount of money that the government paid plaintiff under the Assistance Agreement far exceeded the amount claimed and therefore plaintiff does not have a net loss. *See* Def.'s Br. at 40. Plaintiff contends that none of these amounts should be deducted from Westfed's reliance damages because Westfed retained no benefit from the contract after the seizure of New Western. Pl.'s Reply at 6 n. 6.

Unlike many other thrifts in the *Winstar* context, Westfed did not have the opportunity to sell New Western or to recoup some of

---

**24.** This amount was briefed by both parties as $30 million, but the court finds that the correct amount of money in question is $29.7 million, consisting of $10.44 million in Westfed's liquidity reserve and $19.26 million in Westfed's general corporate purposes fund. *See* DX 380 at FWE036 1347.

**25.** Ariadne was a foreign investor group that had initially committed to finance Westfed's acquisition of Old Western but withdrew when it experienced severe financial problems. *See* Tr. at 92, 222, 677.

its losses because New Western was seized by the government in June, 1993. Because New Western was seized, Westfed did not retain any of the benefits that FSLIC bestowed on New Western in the Assistance Agreement. Therefore, the court declines to offset plaintiff's reliance damages by the amount of FSLIC assistance.

In summary, plaintiff offered sufficient evidence to prove with "reasonable certainty" that it is entitled to $305.382 million in reliance damages. Plaintiff proved that it spent $190.4 million to purchase Old Western and Bell in reliance on its contract with the government. *See* Part II.A.1.a. Plaintiff also showed that it spent $43.696 million in cash interest and dividend payments on debt that was issued in reliance on the contract. *See* Part. II.A.1.b. Finally, plaintiff proved that $71.286 million in payments-in-kind was paid on that same debt that was issued in reliance on the contract. *See* Part II.A.1.c. Plaintiff also satisfied the additional requirements of reliance damages, proving that these amounts were foreseeable at the time of the contract, *see* Part II.A.2, and that the loss of these monies was caused by the breach of the contract. *See* Part II.A.3.

### 5. Offset of Damages by Losses That Would Have Been Incurred Absent the Breach

■ Defendant may offset plaintiff's damages with any benefit plaintiff retained from the expenditures or with any losses that defendant can prove that plaintiff would have incurred if there had been no breach. *See Restatement (Second) of Contracts* § 349; *Westfed Holdings,* 52 Fed.Cl. at 161; *see generally L. Albert & Son v. Armstrong Rubber Co.,* 178 F.2d 182, 189 (2d Cir.1949). The ability of defendant to offset plaintiff's reliance damages is an issue separate from whether the causal link exists between the breach and the damages. Even if the causal link exists, defendant still has the opportunity to prove "with reasonable certainty" that plaintiff would have incurred losses absent the breach. Defendant may then offset the reliance damages award by those proven losses. As a comment to the Restatement explains "[I]t is open to the party in breach to prove the amount of the loss, to the extent that he can do so with reasonable certainty under the standard stated in § 352, and have it subtracted from the injured party's damages." *Restatement (Second) of Contracts* § 349, cmt. a.

■ Although defendant did show at trial that factors other than the breach affected New Western's business, the court finds that defendant did not prove with "reasonable certainty" that plaintiff would have suffered losses absent the breach. Neither of defendant's experts attempted to determine what New Western would have experienced in the "but-for" world if the government had not breached. *See* Tr. at 1778–79, 3339–41. Dr. Hamm agreed with the characterization that attempting to determine what would have happened to New Western if there had been no breach "would require a great deal of speculation."[26] Tr. at 3340. In this case, defendant has not shown that an offset exists for any benefit retained from the expenditures because New Western was seized by the government and therefore plaintiff did not retain any benefit from the expenditures it or the government made in reliance on the contract. In light of the testimony and evidence presented at trial, the court finds that no losses were proven that may be offset against the plaintiff's reliance damages.

### B. Restitution Damages

■ The objective of restitution is "to restore the parties to the status quo ante,"

---

**26.** Mr. Rafferty, counsel for plaintiff, questioned Dr. Hamm about the possibility of creating a model to determine what New Western would have done if there had been no breach:

Q: Did you prepare any model as to what [New] Western would have looked like if it had followed it original 1988 business plan?

A: No.

. . . .

Q: Okay. And you were able to do that if you had so chosen, weren't you?

A: To create a model of what the but-for [New] Western would have looked like?

Q: Yes.

A: You could create a model. The extent to which it would be reliable is another question, but you could create a model.

Q: Okay. The problem with creating such a model is that it would require a great deal of speculation, wouldn't it?

A: Yes.

Tr. at 3339–40.

that is, to return the parties to their positions had there never been a contract. *Glendale*, 239 F.3d at 1380 (internal citations omitted). There are two measures of restitutionary damages: (1) the value of the benefits received by the breaching party due to the non-breaching party's performance; and (2) the cost of the non-breaching party's performance, including both the value of the benefits provided to the breaching party and the non-breaching party's other costs incurred as a result of its performance under the contract. *See Landmark*, 256 F.3d at 1372. The non-breaching party's restitution damages must be reduced by the value of any benefits that it received from the breaching party under the contract. *See id.* at 1373.

Plaintiff seeks restitution based on plaintiff's cost-of-performance under the contract in the same amount and as an alternative to reliance damages. Pl.'s Br. at 22. Because this theory was not the focus of the trial and because the court has awarded as reliance damages the same amount claimed as cost-of-performance restitution, the court declines to address plaintiff's claim for cost-of-performance restitution.

■ Plaintiff also seeks restitution in the amount of loss avoided by defendant under the contract. Pl.'s Br. at 22. Plaintiff calculates its claim for loss avoidance restitution by determining the amount in liquidation costs defendant allegedly saved when plaintiff acquired Bell. Pl.'s PFFF ¶¶ 71–72. As plaintiff points out, this court previously held that plaintiff could recover loss avoidance restitution if it proved at trial that liquidation was defendant's only alternate method of disposal to the acquisition by plaintiff. *See Westfed Holdings*, 52 Fed.Cl. at 164.

Defendant maintains that restitution is inappropriate because the nature and value of benefits conferred upon the government is not readily determinable. Def.'s Br. at 40–41. Defendant argues that plaintiff did not confer any benefit on the government, and, even if it did, plaintiff's analysis of the resulting loss avoided is speculative. *Id.* at 42.

The court is not convinced by the evidence presented by plaintiff that the government would have liquidated Bell if the merger of Bell and Old Western had not taken place.

Although plaintiff was able to show that liquidation was a possibility, Tr. at 2771, plaintiff did not show the court that liquidation was the only alternative left to FSLIC. The court finds that the testimony of Professor Gorton, plaintiff's expert, that the liquidation of Bell was the "next best alternative" for the government, *see* Tr. at 1359, was speculative and, moreover, is at odds with the testimony of fact witnesses who were present at the time of the bidding for Bell.

Jack Reidhill, the division director of the Analysis and Evaluation Division of FSLIC at the time, *see* Tr. at 1821, testified that liquidation was an "alternative of last resort" and that large institutions would often be put "back into the bidding queue" if liquidation was the least costly alternative. Tr. at 1827–28. Mr. Jupiter of OTS testified that FSLIC would not have liquidated Bell if it had not been acquired by Westfed because the regulators considered Bell "a viable institution in terms of its profitability" and that "down the road there would be other opportunities to sell it." Tr. at 2737.

In addition, it is apparent that FSLIC did have alternatives to liquidation for managing Bell. Mr. Jupiter testified that it was FSLIC's practice to negotiate with bidders and potential bidders and that it was entirely possible that an inadequate preliminary bid could be brought up to FSLIC's expectations. *See* Tr. at 2778. The court finds it entirely possible that, had Westfed not acquired Bell, other companies who had unsuccessfully submitted bids for Bell, *see* Tr. at 2769, could then resubmit their bids and negotiate with FSLIC to acquire Bell. Westfed itself understood at the time it submitted its final bid that it was "in a competitive environment to acquire [Bell]." Tr. at 88–89 (Testimony of Mr. Harding). Plaintiff is not entitled to restitution measured by the amount of loss avoided by defendant.

C. Affirmative Defense of Failure to Mitigate

■ A party may not recover for "loss that the injured party could have avoided without undue risk, burden or humiliation." *Restatement (Second) of Contracts* § 350(1).

However, the injured party "is not precluded from recovery ... to the extent that he has made reasonable but unsuccessful efforts to avoid loss." *Restatement (Second) of Contracts* § 350(2). The court must "consider whether a reasonable person, acting in the light of the known facts and circumstances, would have taken steps to avoid certain damages." *Koby v. United States*, 53 Fed.Cl. 493, 497 (2002). An injured party who takes reasonable steps to avoid loss is protected even if his efforts fail. *Restatement (Second) of Contracts* § 350, cmt. h. In addition, the burden is on the breaching party to show that reasonable possibilities for mitigation existed and were ignored. *See Koby*, 53 Fed.Cl. at 497 (internal citations omitted). The breaching party may not invoke the rule of mitigation "as a basis for hypercritical examination of the conduct of the injured party, or merely for the purpose of showing that the injured [party] might have taken steps which seemed wiser or would have been more advantageous to the defaulter." *Id.* (internal citations omitted).

■ Defendant claims that plaintiff made no attempt to mitigate damages and therefore cannot recover reliance damages. *See* Def.'s Br. at 37. Defendant also argues that plaintiff was required to either reduce assets or raise capital in order to compensate for the withdrawal of the modified capital requirement. *Id.* (citing *Cal. Fed. Bank v. United States*, 245 F.3d 1342, 1350 (Fed.Cir. 2001)). According to defendant, plaintiff did neither and therefore did not fulfill its duty to mitigate the alleged harm. Def.'s Br. at 37–38.

Here, however, plaintiff cooperated with defendant after the breach by submitting the 1989 Business Plan and focusing on bringing New Western into compliance with the capital requirements of FIRREA. *See* PX 111. Several witnesses testified that, following the passage of FIRREA, New Western concentrated on achieving capital compliance. *See* discussion *supra* Part II.B.3.b. Defendant itself has acknowledged that in order to achieve capital compliance under FIRREA

plaintiff could "either raise capital or reduce assets." Def.'s Reply at 22. New Western attempted to mitigate and achieve capital compliance both by shrinking and cutting costs, and by attempting to raise capital. *See* Tr. at 791, 2292, 2570–72.

The evidence makes it clear that plaintiff made reasonable efforts to raise capital following the imposition of FIRREA but that those efforts were unsuccessful because of the breach itself. Documentary evidence shows that plaintiff was in negotiations with pension funds that were interested in investing several million dollars in New Western. PX 102; DX 438 at PWE013 0413. Shortly after the imposition of FIRREA, the pension funds "withdrew their interest, citing a new policy not to invest in the thrift industry." DX 438 at PWE013 0413. New Western later had difficulty convincing investors to put their money into the thrift because of FDICIA regulations that required capital guarantees from new controlling stockholders. *See* Tr. at 2333–34. As Mr. Mark Nussbaum, the chief financial officer of New Western from 1991 through June 1993, *see* Tr. at 2119, explained, an investor "would have to provide continued assistance" under FDICIA and would be expose to an unlimited potential liability. Tr. at 2334. New Western's later efforts to raise capital also failed because it was "impossible to attract investors" once New Western was designated as "critically undercapitalized" by OTS. Tr. at 2330–31. In these circumstances, plaintiff was not legally required to mitigate by putting more of its own money at risk. *See Restatement (Second) of Contracts*, § 350, cmt. g; *see also Koby v. United States*, 53 Fed.Cl. 493, 497 (2002). For the foregoing reasons, the defense of failure to mitigate is not available to defendant.

### III. Conclusion

For the foregoing reasons, plaintiff is entitled to recover $305,382,000.00 in reliance damages.[27] The Clerk of the Court is direct-

---

27. Defendant's Motion for Judgment Upon Partial Findings, filed September 25, 2002, is hereby MOOT.

ed to enter judgment for plaintiff in the amount of $305,382,000.00.

IT IS SO ORDERED.

### Evidence Appendix

#### A. Introduction

During coordinated discovery in this case, the court entered a master stipulation concerning the authenticity of documents, production of demonstrative exhibits and other matters (Master Stipulation).[28] In an order dated July 22, 2002, this court adopted the Master Stipulation as an initial guide to its evidence rulings. The Master Stipulation established a rebuttable presumption of the authenticity of documents bearing an identification number pursuant to the Master Protective Order.[29] *See* Master Stipulation at ¶ B.1. The Master Stipulation excepted from its authenticity ruling handwritten notes, which could be authenticated at trial "in any manner permitted by the Federal Rules of Evidence." *Id.* at ¶ B.2.

The Master Stipulation also stated that nothing in the Master Stipulation shall be construed "as an agreement concerning the admissibility of any document at trial, or an agreement concerning the applicability of any Rule of Evidence other than the Rules governing authenticity of documents." *Id.* at ¶ B.3. Although it did not constitute a stipulation on admissibility, the Master Stipulation added that "parties to individual cases may,

however, enter into further stipulations in each case concerning these matters." *Id.*

In this case, the parties declined to resolve any significant evidentiary disputes by stipulation. Transcript of July 17, 2002 Pretrial Conference (July 17, 2002 Tr.) at 45–46, 66, 71. Some 200 exhibits were proposed by plaintiff and some 900 by defendant.[30] Over 900 objections were made at a pretrial conference held on July 17 and 18, 2002, the majority by plaintiff.[31] It became apparent that the parties had sufficiently different views of how certain types of objections should be treated that the objections would need to be categorized, briefed and resolved by the court. The court ordered and received briefing on several categories of objections and on the admissibility of several specific contested documents.[32] The court entered its order on admissibility of exhibits orally at a further pretrial conference on August 29, 2002. This Evidence Appendix sets out the substance of the court's oral orders on exhibits, the resolution of subsequent evidentiary disputes, and the resolution of motions at trial regarding expert testimony.

#### B. Statements of New Western[33] Not Admissions

A salient fact affecting both parties' approach to the evidence was the circumstance that, as a result of the liquidation of New Western, the thrift was not a party-opponent.

**28.** Master Stipulation and Order Concerning Authenticity of Documents, Draft Expert Reports, Videotaping of Depositions, Exhibit Lists, Order of Trial Witnesses, and Production of Demonstrative Exhibits (Master Stipulation), filed December 7, 1999 in *Plaintiffs in All Winstar–Related Cases at the Court v. United States*, Nos. 90–8C, et al.

**29.** Master Protective Order, filed November 26, 1996 in *Plaintiffs in All Winstar–Related Cases at the Court v. United States*, Nos. 90–8C, et al.

**30.** *See* Plaintiff's Preliminary Witness and Exhibit Lists, filed May 31, 2002; Defendant's Motion for Leave to File Defendant's Amended Exhibit List, filed July 15, 2002.

**31.** *See* Plaintiff's Revised Objections to Defendant's Proposed Exhibit List, filed July 17, 2002;

Defendant's Revised List of Objections, filed July 15, 2002.

**32.** In response, the parties filed the following documents with the court: Defendant's Post–Conference Brief (Def.'s Post–Conf. Br.); Response of [Westfed] to Government's Post–Conference Brief (Pl.'s Post–Conf. Resp.); Defendant's Reply in Support of its Post–Conference Brief (Def.'s Post–Conf. Reply); Memorandum of [Westfed] in Support of Objections to Defendant's Proposed Exhibits (Pl.'s Exh. Mot.); Defendant's Response to Plaintiff's Objections to Defendant's Trial Exhibits (Def.'s Exh. Resp.); and Plaintiff [Westfed's] Reply to Defendant's Response to Plaintiff's Objections to Defendant's Trial Exhibits (Pl.'s Exh. Reply).

**33.** The Evidence Appendix employs abbreviations used in the Opinion.

Defendant sought to offer New Western's statements against Westfed as party-opponent admissions under Federal Rules of Evidence 801(d)(2)(D) (Admission by party-opponent is "a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship."). The issue was whether admissions of a subsidiary could be attributed to its corporate parent Westfed.[34] Both parties acknowledged and the court agreed that the question should be decided under principles of agency law under Fed.R.Evid. 801(d)(2)(D). Def.'s Exh. Resp. at 5; Pl.'s Exh. Reply at 3; *Zenith Radio Corp. v. Matsushita Elec. Industrial Co.*, 505 F.Supp. 1190, 1247 (E.D.Pa.1980) (subsequent history omitted); *see also Big Apple BMW, Inc. v. BMW of No. Am., Inc.*, 974 F.2d 1358, 1373 (3d Cir.1992); Fed.R.Evid. 801(d)(2)(D). Because Rule 801(d)(2)(D) expressly provides that the statement be made by the "party's agent," defendant, as proponent of the evidence, was required to establish the existence of an agency relationship. "[A]n agency relationship 'results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other to so act.'" *Brubaker Amusement Co. v. United States*, 304 F.3d 1349, 1360 (Fed. Cir.2002) (internal citations omitted).

Plaintiff argued that defendant did not demonstrate that Westfed exercised the necessary control over New Western to establish an agency relationship. Pl.'s Exh. Reply at 4–8. To support its argument, plaintiff pointed to the fact that the two entities shared only two common directors; that New Western held its own meetings; that the regulators reviewed each company separately; and that New Western was in charge of its day-to-day operations. *Id.* Plaintiff also pointed out that defendant's argument was in direct conflict with the position defendant took at an earlier point in the case when it argued that Westfed had no standing. *Id.* at 7 n. 4.

The court agreed with plaintiff that an agency relationship was not established. Westfed managed none of New Western's day-to-day operations. Pl.'s Exh. Mot. at 22; Pl.'s Exh. Reply at 7. The regulators treated the entities separately at all times. In fact, the regulators guarded against the domination and control that defendant contended existed. Pl.'s Exh. Reply at 6. Importantly, defendant made no showing that Westfed had ever authorized New Western to speak on Westfed's behalf. *See Precision Piping & Instrum., Inc. v. E.I. du Pont de Nemours & Co.*, 951 F.2d 613, 619 (4th Cir.1991).

### C. Statements of Westfed's Consultants Not Admissions

Defendant also sought to introduce the reports, analyses and presentations prepared for Westfed at Westfed's expense by Kaplan, Smith, & Associates, Inc., Kenneth Leventhal & Company, KPMG Peat Marwick, Goldman Sachs & Co. and Messrs. Rafe de la Gueronnierre, Gary Fieldler and Joe Whiteside as party admissions against Westfed under Federal Rules of Evidence 801(d)(2)(D). Defendant argued that these entities and individuals were agents of Westfed. Def.'s Exh. Resp. at 5. Westfed contended that the firms and individuals were hired as independent consultants. Pl.'s Exh. Reply at 11.

Defendant did not, however, provide evidence to establish an agency relationship between these entities and individuals and Westfed. Defendant did not demonstrate that plaintiff had control over these entities or individuals and or that plaintiff directed them in any meaningful way. There was no evidence that defendant controlled the per-

---

34. Defendant, citing *United States v. AT & T*, Civ. No. 74–1698, 1981 WL 2047, *4–5 (D.D.C. Apr.9, 1981), argued that statements made by a subsidiary are admissions of the parent company where "'there is a close functional relationship' between the two entities." Def.'s Exh. Resp. at 2. Defendant pointed to the fact that the two entities shared common directors, that New Western was wholly-owned by Westfed and was Westfed's primary source of income, and that the regulator's reports indicated concerns "about Westfed and its affiliates exerting undue influence on [New] Western." *Id.* at 2–3. Plaintiff argued that the *AT & T* court's "close functional relationship" test improperly relaxes the standard of Rule 801(d)(2)(D). *See* Pl.'s Exh. Reply at 8–11. The *AT & T* case appears to the court to involve such a unique set of business relationships in the telephone industry that it is not readily applicable to this case as precedent.

sonnel or the consultants used, or that any conclusions the consultants drew were not at their discretion. Moreover, the consultants were paid a fee, not a salary with taxes withheld. Pl.'s Exh. Reply at 13.

Defendant sought also to show that the statements of these entities and individuals were admissible under Rule 801(d)(2)(B).[35] *See* Def.'s Exh. Resp. at 7; Fed.R.Evid. 801(d)(2)(B) (Admission by a party-opponent includes "a statement of which the party has manifested an adoption or belief in its truth."). Defendant argued that, because Westfed relied upon the statements and used the information, Westfed manifested its belief in the truth of these statements. Def.'s Exh. Resp. at 7.

Beyond its conclusory argument in briefing that Westfed relied upon the statements of these consultants, defendant did not demonstrate a manifestation of adoption. In order for a statement to be admitted as an adoptive admission, the proponent of the evidence must show "a manifestation of [the other] party's intent to adopt another's statements, or evidence of the party's belief in the truth of the statements ...." *United States v. Rollins*, 862 F.2d 1282, 1296 (7th Cir.1988). Absent a showing of either an agency relationship or adoption, the statements made by these individuals and entities were not admitted as party admissions.

**35.** Defendant did not cite to Rule 801(d)(2)(B) in briefing, but argued, in line with the rule, that Westfed relied on the statements and that Westfed's "[u]se of the information and statements manifest[ed] Westfed's or [New] Western's belief in its truth." Def.'s Exh. Resp. at 7.

**36.** Any exhibit admitted under the business records exception, absent a waiver, was required to satisfy the foundation requirement. A qualified witness was required to testify that the documents were prepared by a person regularly engaged in the preparation of such documents. The qualified witness need not have been the author of the document, but must have had knowledge of the document's preparation. In addition, the document must have been shown to be made at or near the time of the matter recorded by a person with knowledge. *See* Fed.R.Evid. 803(6).

**37.** Rule 803(6) excepts from hearsay:

### D. Hearsay

Absent a stipulation or a ruling allowing admissibility as admissions, each of New Western's documents needed to come in under some exception to hearsay.[36] That fact put enormous pressure on both parties to define the limits of the exceptions to hearsay, particularly the business records exception contained in Rule 803(6).[37] The disputed documents were in the form of memoranda, e-mail, correspondence, reports, work papers, drafts and meeting minutes. Additional layers of complexity were created by third party documents and by material within documents that contained hearsay within hearsay.

#### 1. E-mails, Non-recurring Letters and Internal Memoranda

Plaintiff argued that the regularity requirement ("if kept in the course of a regularly conducted business activity, and if was the regular practice of that business activity to make the [document]") is the touchstone of the rule. *See* Pl.'s Exh. Mot. at 4–6; Fed. R.Evid. 803(6). Plaintiff urged that a document must have been created on a routine and reoccurring basis in order to satisfy the rule. *See* Pl.'s Exh. Mot. at 4–6. Plaintiff argued that e-mails and certain internal memoranda should be excluded because of the casual tone and lack of formality with which they were written. "Documents created 'on the fly,' without the intention or obligation to create a reliable business record, lack the indicia of trustworthiness necessary

Records of regularly conducted activity. A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, ... unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term "business" as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.
Fed.R.Evid. 803(6).

to render them admissible as out-of-court testimony." Pl.'s Exh. Mot. at 8. Defendant argues for admissibility when emails or memos were drafted as part of a regular business activity and routinely maintained in a business file, *see* Def.'s Exh. Resp. at 37, even if not on a routine or recurring basis. *See id.* at 13.

The business record exception to hearsay is justified by the trustworthiness that is typically afforded by regularly kept records. *See McCormick on Evidence,* § 288 at 256 (John W. Strong ed., 5th ed.1999). Business records that are "made systematically or as a matter of routine to record events or occurrences, to reflect transactions with others, or to provide internal controls" reflect a higher "probability of trustworthiness ... because they [a]re routine reflections of the day to day operations ...." *Palmer v. Hoffman,* 318 U.S. 109, 113–14, 63 S.Ct. 477, 87 L.Ed. 645 (1943). The court believes that documents that are created solely at the author's discretion raise motivational concerns and lack the reliability and trustworthiness that business records are ordinarily assumed to have. *See McCormick on Evidence,* § 288, at 257.

Under defendant's approach, all e-mail on a business topic and kept in a business file would be admissible. The courts have not adopted that approach. *See generally New York v. Microsoft Corp.,* No. CIV A. 98–1233(CKK), 2002 WL 649951 (D.D.C. Apr. 12, 2002). The fact that e-mail was used as a regular form of communication does not alone satisfy the business records exception. *See United States v. Kim,* 595 F.2d 755, 762 (D.C.Cir.1979) (noting that the use of a regular business means of communication does not in itself prove that the communication had a regular business purpose). The court agreed with plaintiff that e-mails recounting telephone or hallway conversations or offering curbside opinions are too informal to satisfy the business records exception to hearsay. *See* Pl.'s Exh. Mot. at 8–9; *see also Microsoft,* 2002 WL 649951 at *2. For example, the author may choose to write an e-mail only when a meeting goes well to bolster a particular position or may choose to write e-mail when a meeting goes poorly as a self-protection effort. E-mails such as DX 917 and DX 918 appeared to the court to contain the kind of chit-chat that would be expected to occur on the phone or during a visit to a colleague's office. They do not have the formality of business purpose that appears to have been contemplated by Fed.R.Evid. 803(6). This reasoning applied as well to certain informal internal memos, such as proposed exhibits DX 216–218 and DX 955–959, that defendant sought to introduce. They are inadmissible because of their casual nature and because of the lack of obligation regularly to record meeting impressions or conversations.

Alternatively, defendant argued that informal emails were admissible under the "present sense impression" hearsay exception under Federal Rules of Evidence 803(1). Def.'s Exh. Resp. at 39. The court disagreed. The critical factor under 803(1) is that the statement describing the event must be "made while the declarant was perceiving the event" or "immediately thereafter." Fed.R.Evid. 803(1). Defendant had the burden to show that this requirement was satisfied with respect to the exhibits it proposed. It is not enough that the e-mails "appear to be fairly contemporaneous" accounts of conversations. Def.'s Exh. Resp. at 39. The rule requires that the statement be actually contemporaneous with the event or be made "immediately thereafter." For example, proposed exhibit DX 917 did not state when the conversation referred to took place. The court is not satisfied with defendant's assertion that "there is no reason to believe that the conversation was not fresh in the speaker's mind" when it drafted the e-mail. Instead the defendant must offer a basis for the court to determine that the statement was contemporaneous. Similarly, proposed exhibit DX 918 merely indicated that the conversation recounted and the e-mail took place on the same day. The case law approves of statements made within minutes of an event. *See United States v. Blakey,* 607 F.2d 779, 786 (7th Cir.1979) (admitted under Fed.R.Evid. 803(1) statements made "between several minutes and 23 minutes" after the activity they described noting that "substantial circumstantial evidence" corroborated the accu-

racy of the statements); *Hilyer v. Howat Concrete Co.,* 578 F.2d 422, 426 (D.C.Cir. 1978) (statement made between fifteen and forty-five minutes after an accident not admitted under Fed.R.Evid. 803(1) because the statement "hardly qualifie[d] as 'immediately.'"); *Miller v. Crown Amusements, Inc.,* 821 F.Supp. 703, 706–07 (S.D.Ga.1993) (admitting Fed.R.Evid. 803(1) statements made within 10 minutes of the event described). Defendant did not meet its burden to support the admission of emails shown to be no more than "fairly contemporaneous" under the present sense impression exception to the hearsay rule.

### 2. Drafts

The parties offered several documents in draft form, both when the final document was also available and when a final document was not available. If the document was of a type that could otherwise be admitted as a business record under Fed.R.Evid. 803(6), the court permitted the draft to be admitted upon the laying of a foundation. The court agreed with defendant that the mere fact that a document is a draft went to weight, not admissibility. *See United States v. Bertoli,* 854 F.Supp. 975, 1025 n. 89 (D.N.J.1994), *affirmed in part and vacated in part by and remanded,* 40 F.3d 1384 (3d Cir.1994). Several documents evidenced the negotiations and development of the acquisition transaction. Such documents were relevant to show the intentions of the parties at the time, notwithstanding that final copies might also be available.

However, the court did not admit draft minutes if final minutes of the same meeting were available. *See Lloyd v. Professional Realty Services, Inc.,* 734 F.2d 1428, 1433 (11th Cir.1984) (excluding draft minutes because they were not trustworthy and "were marked, edited and quite different from the final copy of minutes which had been previously entered into evidence").

### 3. Hearsay within Hearsay

Objections were also made to statements of third parties contained within business record exhibits. The court ruled that every level of hearsay in a document, to be admissible for its truth, must fall within an exception to the hearsay rule. The business records exception does not ordinarily embrace statements made by one who is not a part of the business if the statements are offered for their truth. *United States v. Vigneau,* 187 F.3d 70, 75 (1st Cir.1999). Such statements are excluded unless some other hearsay exception applies to the "outsider" statement. *Id.* at 76. For example, the court excluded third party statements contained within the minutes of meeting for the truth of the matters asserted unless an independent hearsay exception was shown for the third party statements. *See, e.g.,* Tr. at 509, 515.

### 4. Third Party Records

The parties disputed whether documents created by third parties that are maintained in the files of a business are admissible as business records. A document prepared by a third party but incorporated into the records of another entity may be admitted under the Rule 803(6) business record exception to hearsay if that entity "relied upon" the document in its day-to-day operations and if there are other "strong indicia of reliability." *Air Land Forwarders v. United States,* 172 F.3d 1338, 1344 (Fed.Cir.1999). "Strong indicia of reliability" has been held to include such factors as the existence of a legal penalty for falsifying information in the document. *See id.* at 1343–44. Third party documents that were shown to meet the *Air Land Forwarders* test were admitted.

### E. Illustrative Evidence

At trial defendant sought to introduce illustrative exhibits into evidence.[38] *See* Tr. at 1751–52, 3298. Defendant submitted briefing to explain its arguments for the inclusion of illustrative exhibits in the record. *See* De-

---

**38.** During trial and in briefing, the evidence was referred to interchangeably as demonstrative or illustrative evidence. The court refers to the evidence in question as illustrative evidence because the materials "illustrate" testimony already in the record. *See McCormick on Evidence,* § 212, at 3. In the Master Stipulation, the presentation of demonstrative exhibits at trial was anticipated. Demonstrative exhibits are required to be served three days prior to their use at trial. *See* Master Stipulation at ¶ G.

fendant's Response to the Court's Request for Briefing Concerning Illustrative Evidence (Def.'s Illustrative Br.). Defendant argues that illustrative evidence "may" be included in the record as "either facts or data upon which an expert bases an opinion, FRE 703, or as being within the Court's discretion to exercise control over the presentation of evidence, FRE 611(a)." Def.'s Illustrative Br. at 1. As defendant acknowledges by the use of the word "may," a trial judge has discretion in ruling upon the admissibility of illustrative evidence. *See McCormick on Evidence,* § 212, at 5.

Many of the illustrative exhibits included evidence not in the record.[39] The court did not believe that the illustrative exhibits should become a "backdoor" for inadmissible evidence. *See Emigh v. Consolidated Rail Corp.,* 710 F.Supp. 608, 612 (W.D.Pa.1989) ("Rule 703 cannot be used as a backdoor to get the evidence before the [factfinder]."). Furthermore, the court found the analysis of previously admitted evidence to be both cumulative of the testimony of fact witnesses and not otherwise helpful to the trier of fact. For these reasons, the court ruled at trial that defendant's illustrative exhibits were to be marked for identification but not admitted into evidence. *See* Tr. at 1754–55, 3300.

### F. Exhibits Created for Litigation

Plaintiff also moved to exclude from evidence documents that were specifically prepared for this litigation after the commencement of this action. *See* Motion of [Westfed] to Exclude Exhibits Created for This Litigation (Pl.'s Mtn. to Exclude Lit. Exh.). Defendant argued for the admission of these documents under Fed.R.Evid. 803(6); the business record exception to hearsay. *See* Transcript of July 18, 2002 Pretrial Conference (July 18, 2002 Tr.) at 330–37.

In a separate pre-trial order, the court ruled that these documents were excluded because they were created in anticipation of litigation and therefore did not satisfy any hearsay exception. *See* September 17, 2002 Order. The court found that, because they were created "specifically for these goodwill cases," Pl.'s Mtn. to Exclude Lit. Exh. at 2 (*quoting* Deposition of J. Craig Sweeney, at 162), and not "prior to the cases," *id.,* these documents do not have the indicia of reliability required by Rule 803(6). *See McCormick on Evidence,* § 288, at 257, n. 31 ("[W]here the only function that the report serves is to assist in litigation or its preparation, many of the normal checks upon the accuracy of business records are not operative.").

### G. The Record at Trial

On July 22, 2002, when the court scheduled briefing on evidentiary objections, the court confirmed to the parties that the court intended to limit the record at trial in order to assist the court in reviewing and giving proper consideration to the exhibits and testimony presented. The court directed that

any exhibit and/or any portion of an exhibit the import of which with respect to one or more issues in the case is not specifically pointed out by a fact witness at trial will be disregarded by the court in its determination of the case. "Specifically pointed out" means specific mention, with reference to an exhibit number, and to a specific page number within the exhibit, together with an indication of how the evidence supports or disproves a fact in issue. "Specifically pointed out" shall not include mention for the first time in post-trial briefing. Any exhibit as to which no portion is "specifically pointed out" will be stricken from the record at the end of trial upon motion by either party.

Order, dated July 22, 2002 (July 22, 2002 Order). At the conclusion of trial, the parties agreed on a final list of exhibits.[40] In

---

**39.** An expert may testify based upon documents not admitted into evidence but those underlying documents may not then be admitted into evidence merely because the expert relied on them in forming his opinion. *See* Fed.R.Evid. 703; *see also* Fed.R.Evid. 703 advisory committee notes (2000) ("Rule 703 has been amended to emphasize that when an expert reasonably relies on

inadmissible information to form an opinion or inference, the underlying information is not admissible simply because the opinion or inference is admitted.").

**40.** At the close of evidence both parties submitted lists of exhibits admitted into evidence during trial. *See* Defendant's List of Exhibits Admitted

post-trial briefing, defendant moved to strike exhibit PX 30 because it was never discussed with a witness or moved into evidence. *See* Def.'s Reply at 1. Defendant's motion to strike is GRANTED.

Defendant also objected in its post-trial briefing to citations in plaintiff's post-trial briefing to certain exhibit pages that defendant argues were not "specifically pointed out" by a fact witness at trial within the meaning of the July 22, 2002 Order. *See, e.g.,* Def.'s Resp. at ¶ 62.1.2.2, 63.1.3–64. The court SUSTAINS defendant's objections to such citations. Specific citations made by either party in post-trial briefing and not objected to in post-trial briefing are deemed compliant with the July 22, 2002 Order. The court has taken the foregoing rulings into account in its Opinion in this matter.

## H. Role of Expert Witness/Rule 703

In its evidentiary briefing Defendant moved for clarification of the July 22, 2002 Order as to the role of expert witnesses. *See* Def.'s Post–Conf. Br. at 1–2. Defendant indicated that it understood that the court "will not consider exhibits that have not been discussed by a fact witness," but asked the court to "confirm that the Court will permit [defendant's] expert witnesses to testify based upon documents not admitted into evidence." Def.'s Post–Conf. Reply at 17. The court permitted defendant's expert to testify and rely on documents in conformance with Federal Rules of Evidence 703.[41] Accordingly, defendant's expert witnesses was allowed to testify based upon documents not admitted into evidence, "if of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." *Id.*

## I. Expert Reports

Prior to trial plaintiff moved to exclude defendant's expert reports. *See* Motion of [Westfed] to Exclude Defendant's Expert Reports (Pl.'s Mtn. to Exclude Expert Reports). Plaintiff argued that expert reports and affidavits are inadmissible hearsay. *See id.* at 3. Defendant maintained in pre-trial briefing that expert reports and affidavits are admissible under the Federal Rule of Evidence 703. *See* Def.'s Exh. Resp. at 47. The court determined that expert reports were not admissible for the truth of the matters asserted therein. *See* Order, dated September 17, 2002 (September 17, 2002 Order). While FRE 703 permits an expert to testify based upon material not admitted into evidence, *see* Fed.R.Evid. 703, FRE 703 does not permit such materials to be admitted into evidence.

## J. Challenge to Testimony of Expert Witness

At trial plaintiff sought to exclude of the testimony of Dr. William G. Hamm on several grounds. Plaintiff argued that Dr. Hamm was not qualified as an expert in the areas of thrift industry, thrift management, thrift operation and thrift regulation (collectively, thrift issues);[42] Dr. Hamm's opinions were

---

Into Evidence at Trial (Def.'s List); Plaintiff [Westfed's] List of Exhibits Admitted into Evidence (Pl.'s List). The two lists were the same with the exception of a dispute over two exhibits, PX 27 and PX 39. *See* Def.'s List at 1; Pl.'s List at 1. The court admitted both exhibits at the close of trial. *See* Tr. at 3458–60.

**41.** Rule 703 provides:
> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted. Facts or data that are otherwise inadmissible shall not be disclosed to the jury by the proponent of the

opinion or inference unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect. Fed.R.Evid. 703.

**42.** The court recognized Dr. Hamm as an expert in the fields of economics during trial. *See* Order, dated October 25, 2002. As to Dr. Hamm's role as an expert on thrift issues, the court received the following briefing: Motion Of Plaintiff Westfed Holdings, Inc. ("Westfed") To Exclude Certain Testimony of Dr. William Hamm (Pl.'s Hamm Mot.), Defendant's Corrected Response To Motion of Plaintiff Westfed Holdings, Inc. ("Westfed") To Exclude Certain Testimony of Dr. William G. Hamm (Def.'s Hamm Resp.), and Reply of Plaintiff Westfed Holdings, Inc. In Support Of Motion To Exclude Certain Testimony of Dr. William Hamm (Pl.'s Hamm Reply).

not sufficiently reliable; Dr. Hamm's testimony on thrift issues was of little or no assistance to the trier of fact; and Dr. Hamm's testimony was redundant and cumulative. Pl.'s Hamm Mot. at 4.

Defendant responded that Dr. Hamm satisfied the liberal standards of admissibility for an expert witness under Federal Rule of Evidence 702 and that he had been qualified as an expert in all other *Winstar*-related cases in which he had testified.[43] Def.'s Hamm Resp. at 4–5, 18. Defendant argued that Dr. Hamm provided useful expert testimony that was not improperly cumulative. Def.'s Hamm Resp. at 27, 41. Defendant also alleged that it would suffer "extreme prejudice" if the court permitted significant portions of Dr. Hamm's testimony to be stricken from the record after-the-fact. Def.'s Hamm Resp. at 1.

### 1. Potential Prejudice to Defendant

Defendant contended that plaintiff did not make or preserve its objections at trial sufficiently to enable defendant to develop the record with the witness with the result that defendant would be prejudiced if any of Dr. Hamm's testimony were to be stricken. Def.'s Hamm Resp. at 1.

The court notes significant discussion during Dr. Hamm's first day of testimony regarding plaintiff's objections both to the testimony and the qualifications of Dr. Hamm as an expert. Tr. at 2971–2974, 2982–2984, 3037, 3226–3232, 3243–3244. At the end of voir dire by plaintiff the court informed the

parties that it would hear testimony on all proposed expert topics "subject to a motion to strike." Tr. at 2974. During Dr. Hamm's direct testimony there was an extended colloquy between the court and the parties regarding plaintiff's standing objection to Dr. Hamm's qualifications as an expert in thrift issues and plaintiff's intent to file a motion to strike all related testimony. Tr. at 3226–3232. Based on these discussions on the record, the court does not believe that defendant has shown the prejudice it claims. Defendant cannot have been surprised that the court would consider plaintiff's motion. Defendant had two days of testimony in which to develop the record and establish both Dr. Hamm's qualifications as an expert and the relevance and reliability of his testimony.

### 2. Law Governing Admissibility of Expert Testimony

The admissibility of expert testimony is governed by Fed.R.Evid. 702 which states:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or date, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed.R.Evid. 702. The Supreme Court has held that a trial judge acts as a "gatekeeper"

---

**43.** Defendant maintained that a "glaring inconsistency among the Winstar-related cases" would be created if this court rules against qualifying Dr. Hamm as an expert. Def.'s Hamm Resp. at 20. Plaintiff replied that the gatekeeping determination is case specific and "tied to the facts of a particular case." Pl.'s Hamm Reply at 6 (quoting *Kumho Tire*, 526 U.S. at 150, 119 S.Ct. 1167).

The five cases cited by defendant where Dr. Hamm was admitted as an expert in the *Winstar* arena are all cases where the plaintiff sought expectancy damages in the form of lost profits. *See California Fed. Bank v. United States*, No. 92–138C; *Southern California Fed. Savings Bank v. United States*, No. 93–52C; *Suess v. United States*, 52 Fed.Cl. 221 (2002); *Castle v. United States*, 48 Fed.Cl. 187 (2000); *Glendale Fed.*

*Bank v. United States*, 43 Fed.Cl. 390 (1999), *aff'd in part, vacated in part, remanded by*, 239 F.3d 1374 (Fed.Cir.2001). In those cases, Dr. Hamm evaluated or analyzed the claims put forth by the plaintiffs' experts and opined on the existence or specific amount of damages. Tr. at 3423; *see also* Appendix to Defendant's Corrected Response To Motion Of Plaintiff Westfed Holdings, Inc. ("Westfed") To Exclude Certain Testimony Of Dr. William G. Hamm (Def.'s Hamm App.) at Tabs 1–6. Specifically, Dr. Hamm addressed and countered models offered by plaintiffs' experts. Similarly, in this case Dr. Hamm has been admitted as an expert in the field of economics and his testimony regarding plaintiff's expert's model has been admitted into evidence. *See* Order, dated October 25, 2002.

under Rule 702 to "ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 141, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) (quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 597, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)). In *Kumho Tire,* this gatekeeping requirement was extended to apply to all expert testimony. *See Kumho Tire,* 526 U.S. at 147, 119 S.Ct. 1167. The gatekeeping requirement is "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire,* 526 U.S. at 152, 119 S.Ct. 1167.

Defendant stated in its conclusion that the "proposed expert need only possess some specialized 'knowledge, skill, experience, training or education' that will be helpful to the trier of fact in understanding the evidence or determining a fact in issue." Def.'s Hamm Resp. at 44. The court disagrees. In addition to possessing "knowledge, skill, experience, training, or education," an expert's testimony must also be both relevant and reliable in order to be admitted into evidence. *Daubert,* 509 U.S. at 589, 113 S.Ct. 2786; *Kumho Tire,* 526 U.S. at 147, 119 S.Ct. 1167.

3. Employment Experience of Dr. Hamm

In its attempt to qualify Dr. Hamm as an expert in the thrift issues (relating to thrift industry, thrift management, thrift operation, and thrift regulation), defendant relied on Dr. Hamm's knowledge and experience achieved through work in the area of thrifts. Def.'s Hamm Resp. at 10–17; Pl.'s Hamm Reply at 5. Defendant argued that Dr. Hamm satisfied the liberal standards for admission of expert testimony because of his "specific educational qualifications in the field of economics, coupled with his relevant work experience in Federal and state government offices and at one of the largest and most profitable thrifts in the nation." Def.'s Hamm Resp. at 11. Defendant further maintained that it is the "sum of Dr. Hamm's education in economics and work experiences in and around the thrift industry that are the basis for the expertise." Def. Hamm Resp. at 16–17.

Plaintiff responded that Dr. Hamm's four years at the Federal Home Loan Bank of San Francisco (FHLB–SF) and five years at World Savings and Loan Association (World Savings) did not qualify him as an expert because his involvement in thrift operations was limited in both scope and duration. Pl.'s Hamm Mot. at 10. In addition, plaintiff argued that the remaining twenty-five years of Dr. Hamm's professional experience had "nothing meaningful to do with thrifts" and that the question is whether Dr. Hamm's experience provides a "sufficient basis to qualify him as an expert on the *specific* topics he is opining on." Pl.'s Hamm Mot. at 7, 10.

The court agrees that the issue is not the qualifications of the witness in the abstract or in general but "whether those qualifications provide a foundation for a witness to answer a specific question." *Berry v. City of Detroit,* 25 F.3d 1342, 1351 (6th Cir.1994). *See also Wheeling Pittsburgh Steel Corp. v. Beelman River Terminals, Inc.,* 254 F.3d 706, 715 (8th Cir.2001).[44] Here, the question was the cause of New Western's failure.

Dr. Hamm received a Ph.D. in economics from the University of Michigan in 1969. Tr. at 2933. From 1969 to 1986, Dr. Hamm worked as a federal and then a California official analyzing budgets, programs and legislation. It was clear from his testimony and curriculum vitae (CV), marked for identification as DX 307A, that the thrift industry was not a primary, or even major, focus of Dr. Hamm's responsibilities in either his federal or state positions.

---

**44.** Dr. Hamm has been admitted by this court as an expert in the field of economics based on his educational background and employment experience. *See* Order dated October 25, 2002. The court admitted into evidence his testimony responding to plaintiff's expert Professor Gorton's damage calculations. The court noted the helpfulness of Dr. Hamm's testimony that responded to Professor Gorton's study because of Dr. Hamm's ability to explain potential weaknesses due to his specific experience in modeling similar matters in the past. Tr. at 3228.

Dr. Hamm began his career as a budget analyst in the United States Bureau of the Budget (the predecessor of the Office of Management and Budget) (OMB) in 1969, Tr. at 2932–2933; *see also* Def.'s Hamm Resp. at 11, where his responsibilities included "analyzing all of the issues that arise in connection with the budget and program of his or her assigned agencies and departments." Tr. at 2933. Dr. Hamm was promoted from budget analyst to head of the HUD branch and later to deputy associate director of one of OMB's eight operating divisions. Tr. at 2934–2935.

While Dr. Hamm testified that as deputy associate director he had "responsibility" for HUD, the Federal Home Loan Bank Board, the FSLIC and Freddie Mac, Tr. at 2935, and that he worked on task forces which had a common objective of "trying to modernize the regulatory system for financial institutions," Tr. at 2936, Dr. Hamm's CV stated that his responsibilities at OMB were to "analyze[ ] and ma[k]e recommendations to the President on the programs/budgets of 3 cabinet-level agencies with $60 billion in spending authority." DX 307A at 7. It is clear that thrift issues were among many things on the plate of a busy official.

In 1977, Dr. Hamm left OMB and began work at the Office of the Legislative Analyst for the State of California. As legislative analyst, Dr. Hamm "headed an office with 95 people and [their] job was to provide objective and nonpartisan analysis and recommendations to the California legislature and to the people of California." Tr. at 2937. When asked about involvement with financial institutions as a legislative analyst, Dr. Hamm testified that his responsibilities included "analyzing the programs and budgets of the California Department of Savings and Loan and the California Department of Banking," Tr. at 2938, that he "testified on bills involving savings and loans or banks many, many times," and that he and his staff recommended to the legislature that the charter of new S & Ls be halted because of mounting losses that were a result of ineffective regulation. *Id.* Dr. Hamm's CV states that his office was responsible for "all aspects of state government." DX 307A at 6. Thrift issues could not have been a primary focus in an office with responsibility for "all aspects" of California government.

Dr. Hamm's career clearly focused on thrifts from 1986–1991 because Dr. Hamm worked at a thrift, World Savings and Loan Association (World Savings), first as Vice President of Operations Analysis and later as Vice President of Loan Service. Tr. at 2939–2948. In his first position in the Operations Analysis Department, Dr. Hamm oversaw the analysis of all aspects of World Saving's operations, including "the savings branches, the loan centers, the Appraisal Department, the Underwriting Department, treasury, asset liability management . . . . [and] the Consumer Loan Department." Tr. at 2939. Dr. Hamm was also involved in the preparation of the corporate budget, management of the product profitability system, and analysis of the deposit and loan origination components of World Savings. Tr. at 2940. In addition, Dr. Hamm testified that he was frequently involved in creating various models at World Savings in order to understand how internal and external factors would affect the company's performance. Tr. at 2942. As head of World Saving's Loan Service Department for a term of less than two years, Dr. Hamm ensured collection of principal and interest payments, as well as tax and insurance payments. Tr. at 2946. Dr. Hamm's last position at World Savings was in the Corporate Development Department where he analyzed the Federal Home Loan Bank of San Francisco (FHLB–SF) to determine how it could increase its profitability and generate more revenue. Tr. at 2947–2948.

Dr. Hamm left World Savings to become Senior Vice President of the FHLB–SF. Tr. at 2949. While at FHLB–SF, Dr. Hamm held several positions. Initially Dr. Hamm was responsible for strategic planning and budgeting but additional responsibilities for information systems, real estate, corporate properties, and administration were added when he became Senior Vice President for Administration. Tr. at 2951. Only four months later, Dr. Hamm was appointed Senior Vice President of the Sales and Marketing Department and less than a year later he

became the Chief Operating Officer (COO). Tr. at 2952. As COO, Dr. Hamm reported directly to the President and Board of Directors of the FHLB–SF regarding strategic planning, marketing, and sales. *Id.;* DX 307A at 5. His responsibilities included financial reporting and "recruiting customers and selling products to them." Tr. at 2955. As a member of the Credit Committee at FHLB–SF, Dr. Hamm reviewed detailed analyses of FHLB–SF's customers' "financial conditions, performance and management as well as the operating environment." Tr. at 2962. Dr. Hamm "delegated" the responsibility of creating a product profitability system and was "heavily involved in understanding the operating environment of California thrifts." Tr. at 2963–2965.

Both at World Savings and FHLB–SF Dr. Hamm occupied business positions of responsibility. But, with the exception of Dr. Hamm's development of economic models at World Savings, the court does not discern that Dr. Hamm developed, employed or applied any expert methodology or discipline that would distinguish Dr. Hamm's experience from that of other able executives, including many fact witnesses in this case.

After leaving FHLB–SF in 1995, Dr. Hamm joined LECG ("formally known as the Law and Economic[s] Consulting Group") where he is currently employed. Tr. at 2929. While at LECG, Dr. Hamm has worked as a consultant on three categories of projects: public policy issues including pending legislation; private companies and governmental entities; and legal matters, as a consulting or testifying expert. Tr. at 2930–2931. Dr. Hamm's most recent position as consultant for the past seven years with LECG has not specifically addressed thrifts with the exception of his testimony for the government on *Winstar*-related cases. The court does not regard accumulated experience in testifying in other cases as in itself proof of expertise relevant to this case. *See* 29 Charles Alan Wright & Victor James Gold, *Federal Practice and Procedure* § 6265 n. 14 (1997 & Supp.2002).

Significantly absent from Dr. Hamm's background is any educational or research background in thrifts or banking. Dr. Hamm has not written any publications, let alone any peer-reviewed works, on the thrift issues, nor has he taught any classes in an institution of higher learning that focused on the thrift issues. *See* Tr. at 2932–33, 2969.

4. Reliability of Testimony

Plaintiff contended that Dr. Hamm's expert opinion rested on unreliable methodologies because his testimony consisted only of his "recital of selected 'facts'." Pl.'s Hamm Reply at 7. Defendant responded that Dr. Hamm applied his expertise throughout his testimony. Def.'s Hamm Resp. at 27.

All forms of expert testimony must "have a reliable basis in the knowledge and experience of [that] discipline." *Kumho Tire,* 526 U.S. at 148, 119 S.Ct. 1167 (quoting *Daubert,* 509 U.S. at 592, 113 S.Ct. 2786). There is no "definitive checklist or test" to determine if testimony is reliable, instead the "inquiry must be 'tied to the facts' of a particular 'case.'" *Id.,* at 150, 113 S.Ct. 2786 (quoting *Daubert,* 509 U.S. at 591, 113 S.Ct. 2786).

Defendant argued that Dr. Hamm applied his expertise to the underlying facts to form his expert opinions. Def.'s Hamm Resp. at 28. Plaintiff argued that if Dr. Hamm applied any methodology it was "nothing more than *ipse dixit.*" Pl.'s Hamm Reply at 10. The court has been unable to discern a particular reasoning or methodology supporting Dr. Hamm's opinions on thrift issues beyond his observations based on the facts in evidence. Dr. Hamm did not conduct any evaluations or studies of the books or records of New Western, nor did Dr. Hamm create any models in the formulation of his opinions. Tr. at 3339, 3356, 3361, 3365, 3416. Instead, Dr. Hamm merely reviewed the documents produced by the parties and the testimony of witnesses, and made observations based on his past experiences. Tr. at 2975–2977.

5. Assistance to Trier of Fact and Relevance of Testimony.

Plaintiff drew the court's attention to sections of Dr. Hamm's testimony which directly conflicted with defendant's own fact witnesses. *See* Pl.'s Hamm Mot. at 23–26. For example, Dr. Hamm's testimony was in di-

rect conflict with that of Jack T. Reidhill, the government witness with firsthand knowledge of the Analysis and Evaluation Division of the FSLIC. *See* Pl.'s Hamm Mot. at 23–24. Dr. Hamm testified that "in the event the Westfed transaction had fallen through and World Savings had turned its back on the deal and no other thrift had stepped forward or no other acquirer had stepped forward ... the FSLIC would not have simply left Bell in the management consignment program." Tr. at 3439. Dr. Hamm went on to state that in his opinion FSLIC "would have ...[sold] the branches and not pa[id] off the depositors in order to realize the franchise value of that branch network." *Id.* In contrast, Mr. Reidhill, who was employed by FSLIC at the time and had experience on a task force which developed guidelines for the management consignment program, *see* Tr. at 1830, testified that when a marketing effort is unsuccessful the thrift is put "back in the queue" for further bidding at a later date. Tr. at 1832–1833.

Defendant attempted to explain this difference by stating that Dr. Hamm was testifying as to what method of liquidation FSLIC would have applied to Bell had it not remained in the management consignment program, Def.'s Hamm Resp. at 38, and not, as defendant claims Mr. Reidhill was discussing, what steps FSLIC would have taken had Bell remained in the management consignment program absent a viable bid. *Id.* The court does not agree. Dr. Hamm specifically stated that "FSLIC would not have simply left Bell in the management consignment program." Tr. at 3439. Mr. Reidhill testified that a thrift with no viable bid would be put "back in queue," i.e., the thrift would have remained in the management consignment program. *See* Tr. at 1932–33. The court agrees with plaintiff that there is a direct conflict between Dr. Hamm's and Mr. Reidhill's testimony and this discrepancy goes to the reliability and usefulness of Dr. Hamm's testimony.

Plaintiff also contended that Dr. Hamm's testimony was used to introduce facts not

properly in evidence. Pl's Hamm Mot. at 26–27. Plaintiff cited to several references in Dr. Hamm's testimony to facts not in evidence, Pl.'s Hamm Mot. at 27, and the court notes that several documents detailed in Dr. Hamm's testimony are not in evidence, including PX 61, PX 160, DX 383, DX 670, and DX 771. The court agrees with defendant that Federal Rule of Evidence 703 permits an expert opinion to be based upon facts or data not admissible in evidence. *See* Fed. R.Evid. 703; Def.'s Hamm Resp. at 31–34. But the underlying material for the opinion is not admissible into evidence. Several times during Dr. Hamm's testimony it appeared to the court that Dr. Hamm was not merely advising the court about the basis of his opinion but was instead reading into the record parts of documents not in evidence. *See, e.g.,* Tr. at 3056, 3081, 3119–3123.

Expert testimony will be admissible "[i]f [it] will assist the trier of fact to understand the evidence or to determine a fact in issue." Fed.R.Evid. 702. This "helpfulness" condition goes primarily to relevance. *Daubert,* 509 U.S. at 591, 113 S.Ct. 2786. Expert testimony "is not helpful if it draws inferences or reaches conclusions within the [trier of fact's] competence or within an exclusive function of the [trier of fact]." *Nichols v. American Nat'l Ins. Co.,* 154 F.3d 875, 883 (8th Cir.1998).

Dr. Hamm's opinions on thrift issues were primarily observations based on a review of facts in evidence and matters not in evidence. Dr. Hamm did not create any models nor did he test or examine his opinions using any methodology recognized as reliable. Tr. at 3339, 3356, 3361, 3365, 3416. The court agrees with defendant that an expert's testimony is not rendered useless merely because a lay witness could provide the same, or even conflicting, testimony. Def.'s Hamm Resp. at 29. But the court notes that in this case the lay witnesses generally had more experience in the area of thrifts issues than Dr. Hamm and the additional advantage that they were present at the time the events at issue were taking place.[45]

---

45. The regulators who supervised New Western had the following years of experience: Ms. Williams, 20 years, *see* Tr. at 2557; Mr. Dochow, 30 years, *see* Tr. at 2789–92; Mr. Deardorff, 26 years, *see* Tr. at 1934; Mr. Mar, 14 years, *see* Tr. at 2351–52; Mr. Pon, 32 years, *see* Tr. at 2629.

#### 6. Conclusion

In the light of the foregoing, the court believes that it is within its discretion either to strike the testimony of Dr. Hamm on thrift issues or to admit the testimony and give it such weight as the court finds it to be entitled to. *See Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 141–43, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997) (Trial court's decision to admit or exclude expert testimony is reviewed under the abuse of discretion standard.). The court in this case admits the testimony of Dr. Hamm on thrift issues but affords that testimony little weight. For the foregoing reasons, the Motion of Plaintiff Westfed Holdings, Inc. to Exclude Certain Testimony of Dr. William Hamm is DENIED.

